R. Jeffrey Layne (TX Bar No. 00791083)
jlayne@reedsmith.com
Benjamin Koplin (TX Bar No. 24055792)
bkoplin@reedsmith.com
Megan Alter Hudgeons (TX Bar No. 24001645)
mhudgeons@reedsmith.com
Reed Smith LLP
111 Congress Ave., Suite 400
Austin, TX 78701
T: 512.623.1821
F: 512.623.1802

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* INTEGRA MED ANALYTICS LLC, <br><br> Plaintiff, <br><br> v. <br><br> 1. BAYLOR SCOTT & WHITE HEALTH, <br> 2. BAYLOR UNIVERSITY MEDICAL CENTER – DALLAS, <br> 3. HILLCREST BAPTIST MEDICAL CENTER, <br> 4. SCOTT & WHITE HOSPITAL – ROUND ROCK, <br> 5. SCOTT & WHITE MEMORIAL HOSPITAL – TEMPLE, <br><br> Defendants. | Case No.: 17-CV-0886-DAE |

**DEFENDANTS BAYLOR SCOTT & WHITE HEALTH, BAYLOR UNIVERSITY MEDICAL CENTER DALLAS, HILLCREST BAPTIST MEDICAL CENTER, SCOTT & WHITE HOSPITAL—ROUND ROCK, AND SCOTT & WHITE MEMORIAL HOSPITAL—TEMPLE'S JOINT MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    RELATOR'S ALLEGATIONS AGAINST BSW DEFENDANTS ................................ 3

III.   GOVERNING LAW .......................................................................................... 4

    A.  Elements of an FCA Claim ....................................................................... 4

    B.  The FCA's Public Disclosure Bar ............................................................. 5

    C.  Rule 12(b)(6) Standards of Dismissal ...................................................... 6

         1.     Rule 9(b): Pleading Fraud with Particularity ........................... 6

         2.     Rule 8(a): Stating a Plausible Claim for Relief ....................... 8

IV.   ARGUMENT ..................................................................................................... 9

    A.  The FCA's Public Disclosure Bar Applies and Relator Is Not an Original Source ... 9

    B.  The SAC Fails to Plead Any Particular or Plausible FCA Claim ........................... 12

         1.     Relator Fails to Plead Any FCA Claim with Particularity: Rule 9(b) .... 12

         2.     Relator Fails to Plead a Facially Plausible Claim for Violation of the False Claims Act: Rule 8(a) ........................................................... 18

    C.  Dismissal Should be With Prejudice ......................................................... 20

V.    CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................8, 19, 20

*U.S. ex rel. Atkins v. McInteer,*
    470 F.3d 1350 (11th Cir. 2006) .....................................................................6, 16, 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..........................................................................................*passim*

*U.S. ex rel. Bennett v. Medtronic, Inc.,*
    747 F. Supp. 2d 745 (S.D. Tex. 2010)...............................................................15

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
    501 F.3d 493 (6th Cir. 2007) ............................................................................16

*U.S. ex rel. Branch Consultants v. Allstate Ins. Co.,*
    560 F.3d 371 (5th Cir. 2009) ............................................................................10

*U.S. ex rel. Clausen v. Lab. Corp. of Am.,*
    290 F.3d 1301 (11th Cir. 2002) ........................................................................6

*United States ex rel. Colquitt v. Abbott Labs.,*
    858 F.3d 365 (5th Cir. 2017) ............................................................................*passim*

*U.S. ex rel. Conrad v. Abbott Labs., Inc.,*
    No. CIV.A. 02-11738-RWZ, 2013 WL 682740 (D. Mass. Feb. 25, 2013)..............5

*Corsello v. Lincare, Inc.,*
    428 F.3d 1008 (11th Cir. 2005) ...................................................................16, 17

*United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.,*
    839 F.3d 242 (3d Cir. 2016), *cert. denied sub nom. Victaulic Co. v. U.S., ex*
    *rel. Customs Fraud Investigations, LLC*, 138 S. Ct. 107, 199 L. Ed. 2d 30
    (2017)................................................................................................................14

*U.S. ex rel. Doe v. Dow Chem. Co.,*
    343 F.3d 325 (5th Cir. 2003) ............................................................................20

*Fed. Recovery Servs., Inc. v. United States,*
    72 F.3d 447 (5th Cir. 1995) ..............................................................................2

*U.S. ex rel. Feingold v. AdminaStar Fed., Inc.,*
    324 F.3d 492 (7th Cir. 2003) ............................................................................10

*Fin. Acquisition Partners LP v. Blackwell,*
440 F.3d 278 (5th Cir. 2006) ................................................................8

*U.S. ex rel. Grubbs v. Kanneganti,*
565 F.3d 180 (5th Cir. 2009) ................................................................6

*U.S. ex rel. Harris v. Bernad,*
275 F. Supp. 2d 1 (D.D.C. 2003) ........................................................17

*U.S. ex rel. Hebert v. Dizney,*
295 F. App'x 717 (5th Cir. 2008) .........................................................7

*U.S. ex rel. Jamison v. McKesson Corp.,*
649 F.3d 322 (5th Cir. 2011) ............................................................5, 9

*U.S. ex rel. King v. Solvay S.A.,*
823 F. Supp. 2d 472 (S.D. Tex. 2011), *order vacated in part on reconsideration,* No. CIV.A. H-06-2662, 2012 WL 1067228 (S.D. Tex. Mar. 28, 2012) ..........................................................................................7

*U.S. ex rel. Longhi v. United States,*
575 F.3d 458 (5th Cir. 2009) ................................................................5

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC,*
836 F.3d 770 (7th Cir. 2016) ..............................................................17

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.,*
355 F.3d 370 (5th Cir. 2004) ..............................................................18

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
563 U.S. 401 (2011) .........................................................................1, 5

*Segner v. Sinclair Oil & Gas Co.,*
No. 3-11-CV-03606-F, 2012 WL 12884861 (N.D. Tex. Oct. 19, 2012), *order clarified,* No. 3-11-CV-03606-F, 2012 WL 12885056 (N.D. Tex. Nov. 9, 2012) ...................................................................................................7

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn,*
14 F.3d 645 (D.C. Cir. 1994) ..............................................................10

*U.S. ex rel. Thayer v. Planned Parenthood of the Heartland,*
765 F.3d 914 (8th Cir. 2014) ..............................................................17

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
125 F.3d 899 (5th Cir. 1997) ......................................................6, 7, 18

*Unimobil 84, Inc. v. Spurney,*
797 F.2d 214 (5th Cir. 1986) ................................................................7

*United States v. Catholic Health Initiatives*,
　312 F. Supp. 3d 584 (S.D. Tex. 2018) .................................................................. 19

*Universal Health Servs., Inc. v. United States*,
　136 S. Ct. 1989 (2016) .......................................................................................... 6

*U.S. ex rel. Walker v. Corp. Mgmt., Inc.*,
　No. 2:07-CV-342-KS-MTP, 2012 WL 5287065 (S.D. Miss. Oct. 24, 2012) ........ 16

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
　778 F. Supp. 2d 709 (N.D. Tex. 2011) ............................................................ 15, 16

*U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*,
　336 F.3d 375 (5th Cir. 2003) ............................................................................... 20

*Williams v. WMX Techs., Inc.*,
　112 F.3d 175 (5th Cir. 1997) ........................................................................... 7, 15

*U.S. ex rel. Wismer v. Branch Banking & Tr. Co.*,
　No. 3:12-CV-1894-B, 2013 WL 5989312 (N.D. Tex. Nov. 12, 2013) .................... 7

*U.S. ex rel. Wismer v. Branch Banking & Tr. Co.*,
　No. 3:13-CV-1894-B, 2014 WL 1407584 (N.D. Tex. Apr. 11, 2014) .................... 7

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ......................................................................................... 4

31 U.S.C. § 3729(a)(1)(B) ......................................................................................... 4

31 U.S.C. § 3729(a)(1)(G) ......................................................................................... 4

31 U.S.C. § 3730(e)(4)(A) ......................................................................................... 5

**Rules**

Fed. R. Civ. P. 8(a) .......................................................................................... *passim*

Fed. R. Civ. P. 9(b) .......................................................................................... *passim*

Fed R. Civ. P. 12(b)(6) .................................................................................... *passim*

**Regulations**

72 FR 47130 ...................................................................................................... 13, 14

**Other Authorities**

Department of Health and Human Services Office of Inspector General, "CMS
　Did Not Adequately Address Discrepancies in the Coding Classification for
　Kwashiorkor," A-03-14-00010 (November 2017) ................................................ 11

Centers for Disease Control, ICD-9-CM Official Guidelines for Coding and
    Reporting, Oct. 1, 2011 at 88, available at https://goo.gl/DC55Wx........................................20

Defendants Baylor Scott & White Health, Baylor University Medical Center – Dallas, Hillcrest Baptist Medical Center, Scott & White Hospital – Round Rock, and Scott & White Memorial Hospital – Temple (collectively, the "BSW Defendants") move to dismiss this False Claims Act ("FCA") *qui tam* action because the FCA's public disclosure bar prohibits the suit from proceeding, and pursuant to Federal Rule of Civil Procedure 9(b) for failure to plead fraud with particularity, and pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6) for failure to state a plausible claim. The BSW Defendants request the Court dismiss the Second Amended Complaint ("SAC"), Dkt. 15, in its entirety with prejudice.

## I.      INTRODUCTION

Relator ("Relator" or "Integra") is an outsider who brings a quintessential "parasitic" FCA suit. Despite their "specializ[ation] in statistical analysis to detect and prove fraud . . . in mortgage-backed securities and other financial markets," Integra has recently "successfully initiated numerous" carbon-copy cases against hospital systems nationwide; notably, the government declined to intervene in all of Integra's unsealed suits.[1] SAC ¶ 11. Each opportunistic suit follows the same pattern: Integra "uncover[s] . . . fraud" through so-called "unique algorithms and statistical processes" applied to data received from CMS. SAC ¶ 40.

CMS's data disclosure to Integra is a "public disclosure," which means the suit is barred per the FCA's public disclosure bar. Integra cannot overcome the bar; its "proprietary analysis" and "multi-faceted investigation" bring nothing new to the government: no specific facts showing either fraud or filing false claims. Instead, Relator does what CMS can and does do, and the SAC is "a classic example of the 'opportunistic' litigation that the public disclosure bar is designed to

---

[1] *See, e.g.,* Case No. 2:17-cv-01694-PSG-SS; United States of America, *ex rel.* Integra Med Analytics LLC, v. Providence Health Services, et al; in the United States District Court for the Central District of California (Western Division), at Dkt. #38.

discourage." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 410 (2011). Simply processing CMS's own data cannot justify sending Integra an unearned windfall – a share of any proceeds recovered, plus their attorneys' fees.

By dismissing parasitic FCA suits, federal courts play a vital gatekeeping role. *U.S. ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 373 (5th Cir. 2017) (citing *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995)) (dismissal "balance[s] the competing interests of encouraging whistleblowing while preventing 'parasitic' suits"). Doing otherwise would give rise to a cottage industry of serial relators filing claims to extort money from healthcare providers.

Considering Relator's outsider status vis-à-vis hospitals generally and the BSW Defendants specifically, it is no surprise that Integra fails to plead a specific or plausible "fraudulent upcoding" scheme. SAC ¶ 93. Integra broadly accuses the BSW Defendants of "pressuring" doctors to "change their original diagnoses" and "upcoding" by coders and doctors (which is unusual since doctors do not normally code). *See, e.g.,* SAC ¶¶ 3, 103.

However, Integra offers nothing other than raw conclusory statements, naked assertions, and its own opinions in support of its accusation. Integra identifies ***not a single actor or act of fraudulent upcoding***:[2] neither doctors "pressured" to misdiagnose patients; nor doctors who actually misdiagnosed patients; nor coders who "upcoded" any claims; nor submission of any such "upcoded" claims; nor instructions from any BSW Defendant to apply unsubstantiated diagnoses to claims; and no agreement to do any of the preceding.

Integra thinks a massive multi-year upcoding fraud is the "only plausible explanation" for its "findings." SAC ¶ 103. The findings and the conclusion are both unsubstantiated opinions. Neither constitute, nor are supported by, well-pleaded facts. The SAC must be dismissed with

---

[2] Integra names a single former employee but fails to provide an example of that person or any other person committing a fraudulent "upcoding" act. SAC ¶¶ 2 – 4.

prejudice.

## II.     RELATOR'S ALLEGATIONS AGAINST BSW DEFENDANTS

For purposes of a Motion to Dismiss, the court must accept as true the "well-pleaded facts," stripped of all "conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The well-pleaded facts are as follows:

- BUMC, Hillcrest, S&W Round Rock, and S&W Memorial are hospitals affiliated with Baylor Health, SAC ¶ 1;

- "Like most hospital groups," the four above-named entities have a CDI program, SAC ¶ 20;

- CDI programs are "designed to promote the accurate documentation of a patient's diagnoses and treatments such that they can be properly coded for reimbursement," SAC ¶ 20;

- The former head of the central Texas CDI claimed that CDI adds to revenue (presumably, by capturing all appropriate diagnostic codes) and improves reported metrics, SAC ¶ 20;

- That person trained CDI staff on the types of codes that affect reimbursement and gave them written resources to help them identify where those codes might be applied; SAC ¶ 23;

- Baylor trained physicians on ensuring that clinical documentation aligned with CMS's expectations of documentation supporting reimbursement, that "specificity of language allows accurate coding submission;" SAC ¶¶ 24, 26;

- CDI staff used form queries to communicate with physicians about instances where the physicians' notes did not clearly identify the presence of a specific comorbidity, SAC ¶ 27;

- The form queries listed possible additional diagnoses, which allowed physicians to fill in their own diagnoses or to disagree that any clarification was needed in the "exercise of [physician's] independent professional judgment," and cautioned the physicians: "The fact that a question is asked does not imply that any particular answer is desired or expected." SAC ¶ 28;

- Baylor submitted claims with MCCs, SAC Tables 3, 6, and 9.

Relator's unsupported mischaracterizations, opinions, conclusory statements and interpretations make up the remainder of the SAC. This court need not – and in fact cannot – accept

3

those statements as "true" for purposes of Rules 9(b) and 8(a). They include:

- Baylor's corporate leadership "created a systemwide culture that promoted increasing Medicare billing without regard for accuracy," SAC ¶ 3;

- "Baylor's [CDI] efforts" included "extensive training on how to spike Medicare revenue," and "pushing doctors to change their original diagnoses" to increase frequency of MCCs, SAC ¶ 3;

- Other hospitals' CDI programs focus on "coding for reimbursement," though Baylor's CDI program is "primarily geared toward inflating the hospital system's Medicare revenue," SAC ¶ 20;

- Baylor "deploy[ed] a team of CDI specialists whose job was to persuade doctors to change their documentation to reflect a higher severity of illness than warranted," and Baylor "pressure[d]" medical coders to "upcode" and to "code unethically," SAC ¶¶ 21, 22;

- Baylor "issued directives" to "code a certain way, even if it was not appropriate," SAC ¶ 22.

- Baylor encouraged doctors to "use 'magic words' and 'provide triggers for reimbursement,'" SAC ¶ 24;

- "The only plausible explanation as to the cause of the excessively high rates of Misstated MCCs is that Baylor has implemented practices to maximize the amount of revenue it can receive from Medicare by fraudulently upcoding." SAC ¶ 103.

Again, the Court may not rely upon or accept these unsupported conclusions, opinions, and mischaracterizations, along with all others throughout the SAC, in deciding this Motion to Dismiss.

## III. GOVERNING LAW

### A. Elements of an FCA Claim

Relator alleges liability under three sections of the FCA: (1) "knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval," SAC ¶ 112.a., 31 U.S.C. § 3729(a)(1)(A); (2) "knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim," SAC ¶ 112.b., 31 U.S.C. § 3729(a)(1)(B); and (3) knowingly concealing an obligation to repay money to the United States, SAC ¶ 112.c., 31 U.S.C. § 3729(a)(1)(G). To state an actionable claim under the FCA, a relator

must sufficiently plead four elements: "(1) [that] 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim).'" *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009).

### B. The FCA's Public Disclosure Bar

The FCA's public disclosure bar prohibits a relator from bringing an FCA lawsuit if substantially the same allegations or transactions as those alleged by the relator have been publicly disclosed, including in a report by a Federal agency. 31 U.S.C. § 3730(e)(4)(A); *see U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011) (the bar applies "whenever *qui tam* relators bring a suit based on publicly available information").

The Fifth Circuit applies a three-part test to determine whether the public disclosure bar applies. It asks 1) whether there has been a public disclosure of the allegations or transactions, 2) whether the *qui tam* action is based upon such publicly disclosed allegations or transactions, and 3) if so, whether the relator is the original source of the information. *United States ex rel. Colquitt*, 858 F.3d at 373; *see* 31 U.S.C. § 3730(e)(4)(A).

CMS's responses to data and information requests are "reports" under the bar, and the allegations or transactions "disclosed in a record attached to [the report] . . . are disclosed 'in' a report for the purposes of the public disclosure bar." *Schindler Elevator Corp.*, 563 U.S. 401 (finding that a federal agency's written response to a FOIA request for records as well as the attached records themselves constitute a "report" within the meaning of the public disclosure bar); *U.S. ex rel. Conrad v. Abbott Labs., Inc.*, No. CIV.A. 02-11738-RWZ, 2013 WL 682740, at *5 (D. Mass. Feb. 25, 2013) (data files available to the public on CMS's website were a federal report).

C.      **Rule 12(b)(6) Standards of Dismissal**

1.      **Rule 9(b): Pleading Fraud with Particularity**

Rule 9(b) is a gatekeeper – a tool to weed out meritless fraud claims at an early stage. *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Because FCA actions involve, at their root, fraud, Rule 9(b) applies; the pleading standard for FCA claims is heightened above mere "notice." *Id.* Rule 9(b)'s heightened pleading standard requires an FCA complaint to include "both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted." *U.S. ex rel. Grubbs*, 565 F.3d at 190–91. Rule 9(b) protects FCA defendants from frivolous allegations of fraud that cause undeserved "harm to their goodwill and reputation" and "reduces the number of strike suits." *Id.* at 190, 191 (the FCA's significant financial rewards to *qui tam* plaintiffs incentivizes filing of "baseless claims as a pretext to 'fishing expedition[s]'"); *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (citation omitted, "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'"); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n. 24 (11th Cir. 2002) ("When a plaintiff does not specifically plead the minimum elements of [his] allegation, it enables [him] to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and at worst, . . . baseless allegations used to extract settlements.").

To comply with Rule 9(b)'s heightened pleading standard, the fraud giving rise to FCA liability must be stated "with particularity." FED. R. CIV. P. 9(b); *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2004 n.6 (2016); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). This means Relator must specifically plead

the factual "who, what, when, where, and how" of the alleged fraud. *U.S. ex rel. Thompson*, 125 F.3d at 903. Courts in the Fifth Circuit "apply [Rule 9(b)'s specificity requirement] with force, without apology." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).

FCA pleadings "containing 'general allegations, which do not state with particularity what representations each defendant made' do not meet the Rule 9(b) particularity requirement" because such pleadings do not "link each corporate entity to the scheme or schemes alleged." *U.S. ex rel. King v. Solvay S.A.*, 823 F. Supp. 2d 472, 546 (S.D. Tex. 2011), *order vacated in part on reconsideration,* No. CIV.A. H-06-2662, 2012 WL 1067228 (S.D. Tex. Mar. 28, 2012); *see also U.S. ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722 (5th Cir. 2008) (district court did not abuse discretion in dismissing complaint where relators failed to plead the identity of any corporate actor with particularity beyond "defendants"); *Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986) (explaining that "[t]o state a case for fraud, however, requires a plaintiff to allege with particularity the defendant's acts which the plaintiff contends amount to fraud").

Similarly, "[b]ecause the linchpin of an FCA claim is a false claim, 'the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *U.S. ex rel. Wismer v. Branch Banking & Tr. Co.*, No. 3:12-CV-1894-B, 2013 WL 5989312, at *3 (N.D. Tex. Nov. 12, 2013); *see also U.S. ex rel. Wismer v. Branch Banking & Tr. Co.*, No. 3:13-CV-1894-B, 2014 WL 1407584, at *5 (N.D. Tex. Apr. 11, 2014) (dismissing with prejudice same *qui tam* plaintiff's amended complaint because "conclusory" allegations based solely on relator's "unsourced independent 'knowledge and belief'" do not "live up to Rule 9(b)'s standards"). Establishing a cause of action for "participation in a fraudulent scheme requires the plaintiff to specifically link each defendant to the schemes alleged." *Segner v. Sinclair Oil & Gas Co.*, No. 3-11-CV-03606-F, 2012 WL

12884861, at *2 (N.D. Tex. Oct. 19, 2012), *order clarified,* No. 3-11-CV-03606-F, 2012 WL

12885056 (N.D. Tex. Nov. 9, 2012) (quoting *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d

278, 287 (5th Cir. 2006)).

### 2. Rule 8(a): Stating a Plausible Claim for Relief

To survive a motion to dismiss under Rules 8(a) and 12(b)(6), a complaint must plead

"enough facts to state a claim to relief that is plausible on its face," allowing the Court to "draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atlantic*

*Corp.*, 550 U.S. at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Ashcroft*, 556 U.S. at 668

Testing a complaint's facial plausibility first requires separating any "well-pleaded facts"

from "conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]." *Bell*

*Atlantic Corp.*, 550 U.S. at 555. "[C]onclusory" allegations, "formulaic recitation of the elements

of a cause of action," "labels and conclusions," "naked assertion[s]," and "conclusory assertions

of illegal behavior or intent" must be stripped from the pleading and disregarded. *Ashcroft*, 556

U.S. at 678–680 (citation omitted); *Bell Atlantic Corp.*, 550 U.S. at 555–557. Then, the court must

determine whether the remaining well-pleaded factual allegations, if any, are sufficient to pass the

plausibility test. Testing plausibility is a "context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679. A claim is

"plausible" if the well-pleaded facts "raise a right to relief above the speculative level." *Bell*

*Atlantic Corp.*, 550 U.S. at 555. A claim is not plausible when alternative legally appropriate

explanations are likely or "obvious;" in those circumstances, it is not reasonable to infer unlawful

behavior. *Id.* at 567.

## IV.    ARGUMENT

The SAC should be dismissed in its entirety for multiple independent reasons.

First, because the transactions upon which Relator relies to support this fraud claim were publicly disclosed by CMS, and Relator is not an original source of any facts that purport to support the claims, the claims must be dismissed.

Second, the SAC fails to meet Rule 9(b)'s heightened pleading requirement. Relator fails to plead any factual basis for their belief that the BSW Defendants executed a sprawling upcoding scheme resulting in the submission of false claims. Instead of pleading particular fraud relating to particular claims, Relator's relies on self-styled "unique algorithms," "statistical processes" and "proprietary methods." These are not well-pleaded facts. These "methods" are opinions and nothing more. To find otherwise would be diametrically opposed to well-established FCA jurisprudence.

Third, Relator fails to plead a plausible upcoding fraud per Rules 8(a) and 12(b)(6). Relator instead relies on conclusory statements and incorrect conclusions of law, and its naked assertion that "only" fraud can explain its opinions about the CMS claims data.

### A.    The FCA's Public Disclosure Bar Applies and Relator Is Not an Original Source

The public disclosure bar applies "whenever *qui tam* relators bring a suit based on publicly available information." *U.S. ex rel. Jamison*, 649 F.3d at 327. An exception to the bar exists for a relator demonstrated to be an "original source" of the information. *Id.* The public disclosure bar and its original source exception are designed to work together to "calibrate the incentives for individuals to bring *qui tam* suits under the FCA." *U.S. ex rel. Colquitt*, 858 F.3d at 373. When relators who are original sources bring something of value to the table to supplement the public disclosure, they are rewarded for bringing their claims. *Id.* At 373-74.

However, when the government either "gains nothing from a relator with [only] indirect

knowledge," the suit must be dismissed. *U.S. ex rel. Colquitt* 858 F.3d at 373-374. Courts refer to these bring-nothing relators as "parasitic relators," who cannot be allowed to sue lest they receive "an unnecessary windfall." *U.S. ex rel. Colquitt*, 858 F.3d at 373; *see also U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376 (5th Cir. 2009) (discussing repeated attempts by Congress to balance competing goals of encouraging whistleblowers while discouraging parasitic lawsuits); *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649–51 (D.C. Cir. 1994) (describing the public disclosure bar as an attempt to balance the competing interests of encouraging whistleblowing while preventing "parasitic" suits).

The instant case – rooted entirely in Relator's opinions about publicly-disclosed CMS data – is exactly the type of parasitic lawsuit the public disclosure bar is designed to curtail. Relator's analysis of public data is the alpha and omega of their case. Integra attempts to backfill this analysis with innuendo, conclusory "facts," and a screenshot of a LinkedIn profile, but Integra fails. Relator's logic, in fact, is entirely circular: conclusions about the data lead to conclusions about the CDI program lead to conclusions about the data. *See* SAC ¶ 36. For example, Relator believes the data shows "respiratory failure" is "used excessively;" it attributes to an unnamed source that the BSW Defendants were "influencing doctors to record acute respiratory failure;" the "analysis of Medicare claims shows that Baylor doctors complied with this encouragement." *Id.*

The SAC, lacking all particularity, never "confirms" Relator's "findings." Absent well-pleaded particular information showing "fraud may be afoot," simple statistical analysis alone – all opinion and not fact – likewise fails to surmount the bar. *See U.S. ex rel. Feingold*, 324 F.3d at 496 (internal citations omitted). Relator does nothing the government has not or could not do itself – Integra brings "[nothing] of value to the table." *U.S. ex rel. Colquitt*, 858 F.3d at 373.

Indeed, we know the government routinely applies more robust analyses to the very same publicly disclosed claims data. For example, HHS-OIG, the auditing arm of CMS, has itself

reviewed malnutrition claims as recently as November 2017. Department of Health and Human Services Office of Inspector General, "CMS Did Not Adequately Address Discrepancies in the Coding Classification for Kwashiorkor," A-03-14-00010 (November 2017) (the "discrepancy" was CMS's publication of contradictory coding resources, which led to excessive Medicare spend that CMS had taken no effort to correct). Significantly, the publicly disclosed claims data Integra uses **overlaps** with the claims data set HHS-OIG reviewed in the above-referenced report. *See* SAC ¶ 1 ("all claims submitted to Medicare nationwide since 2011"), HHS-OIG Report, 3 (HHS-OIG reviewed claims from "CYs 2006 through 2014"). Relator is no original source. Integra is the very definition of a parasitic litigant.

Federal courts universally and without exception dismiss cases like Integra's. In doing so, the courts play a vital gatekeeping role, "seeking to balance the competing interests of encouraging whistleblowing while preventing 'parasitic' suits" that give bring-nothing relators an "unnecessary windfall." *U.S. ex rel. Colquitt*, 858 F.3d at 373 (citation omitted). The public disclosure bar gives dismissing courts the power to prevent unjust outcomes vis-à-vis wrongfully-accused FCA defendants and the cottage industry of serial relators extorting money from healthcare providers that would surely result.

Applying the Fifth Circuit's three-part test for applicability of the public disclosure bar under these circumstances, (1) there has been a public disclosure (and in the case of severe malnutrition, more than once); (2) the *qui tam* is based on the information that has been publicly disclosed (in this case, it is based *solely* on that information); and (3) Relator is not an original source of the information. *U.S. ex rel. Colquitt*, 858 F.3d at 373 (citation omitted). Relator's claims must fail.

### B. The SAC Fails to Plead Any Particular or Plausible FCA Claim

#### 1. Relator Fails to Plead Any FCA Claim with Particularity: Rule 9(b)

The fraud alleged by the Relator appears to be that the BSW Defendants, "bill[ed] 'Medicare'] without regard for accuracy . . . [and] push[ed] doctors to change their original diagnoses in ways that would lead to unwarranted MCCs . . . [leading to] significant cases of upcoding." SAC ¶ 3.

In support, Integra offers only one sweeping and conclusory allegation after another. It never pleads actual facts to support its generalized smears. For instance, Integra pleads that the BSW Defendants' CDI program (it fails to specify which defendant's program) is uniquely focused on "inflating" Medicare revenue and creating a "culture of non-compliance." SAC ¶ 20. This is Relator's opinion about how the clinical documentation initiative operated – that "training" (to whom?) and "queries" (by whom and to whom?) constituted "pressure" (on whom?) to "provide unnecessary treatment" (what treatment?) and "code unethically" (in what way?). *See* SAC ¶¶ 22, 37. Integra fails to plead any particular fact, instead it piles opinions upon conclusions.

Relator pleads not a single MCC applied in contradiction to the physicians' diagnoses; not a single physician pressured (or even potentially pressured) to change a diagnosis nor provide unwarranted treatment; and no agreement to do any of these things.

Instead, the SAC *in its entirety* stems from Relator's review of CMS claims data. For example, Relator concludes that physicians "provided unnecessary treatment" because the incidence of the "mechanical ventilation" MCC on claims with the "major heart surgery" DRG is, according to the Relator, "twice the national average." SAC ¶ 37. To substitute its opinions for fact would invert long-established Rule 9(b) jurisprudence uniform across the Federal Circuits: it would allow Relator to discover and derive un-pleaded fraudulent acts (which do not exist) simply because Integra believes the class of claims is fraudulent. This is plainly improper. For Rule 9(b)

to serve as an effective gatekeeper, the SAC must be dismissed.

### a. Relator Fails to Plead Any Facts Supporting Claim that Baylor Billed Medicare for MCCs Not Supported by The Medical Record

Each time any court in any Federal Circuit has considered upcoding claims pleaded in the manner of Integra's SAC, it has kicked out the claims at the motion to dismiss stage. Without exception, the courts uniformly agree on what Rule 9(b) requires for FCA upcoding actions: Relators must specifically plead ***at least one instance of the fraudulent upcoding activity itself***. The SAC fails this straightforward test.

The reason for the test is obvious: broadly-stated opinions about the fraud that ***could*** result from a CDI program are no more indicative of actual fraud than the existence of the CDI program itself (which cannot, in itself, be fraudulent if most hospital groups have a CDI program). Indeed, CMS is fully aware of – and even supports – CDI programs and activities (expressly including programs that employ "clinical documentation specialists that work on the hospital treatment floors to encourage improvements in clinical documentation," allowing hospitals to simultaneously "improve coding and increase payment"). Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates, 72 FR 47130, 47180. CDI programs are not inherently suspect or nefarious. *See* SAC ¶ 20 (negatively contrasting Baylor's alleged CDI program with those of "most hospital groups" in that Baylor's was "primarily geared toward inflating the hospital system's Medicare revenue"). CMS explicitly disagrees with Integra's implication that operating a CDI program to bridge potential gaps between Medicare's coding standards and commonly used clinical language is "evidence" of fraudulent behavior. *See* SAC ¶ 36. When CMS published the final MS-DRG rule in 2007 it sought to "address the notion . . . that CMS believes changes in how services are documented or coded that is consistent with the medical record is inappropriate or otherwise unethical." 72 FR 47130, 47180.

We do not believe there is anything inappropriate, unethical, or otherwise wrong with hospitals taking full advantage of coding opportunities to maximize Medicare payment that is supported by documentation in the medical record.

*Id.* CMS contradicted the rule commenters who, like Integra, believed "taking full advantage of coding opportunities to maximize Medicare payment" would be inappropriate. *Id.* CMS said it fully expected that "hospitals will change their documentation and coding practices and increase case mix consistent with the payment incentives that are provided by the MS-DRG system," and further favorably cited to a third-party analysis of hospital claims suggesting that a hospital that adopted a CDI program had "gained an additional $1.5 million in reimbursement [previously] . . . left on the table" in the first year of its program. *Id.* CMS hoped that the new MS-DRG system would create "additional opportunities to improve documentation and coding" to achieve similar results. *Id.*

In light of CMS's position on CDI programs, Integra's allegations can charitably be described as no more than "unsupported assumptions and numerical guesswork . . . [based on six] years of raw [claims] data." *U.S. ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 260 (3d Cir. 2016), *cert. denied sub nom. Victaulic Co. v. U.S., ex rel. Customs Fraud Investigations, LLC*, 138 S. Ct. 107, 199 L. Ed. 2d 30 (2017). Federal Courts all agree with *Victaulic:* "Rule 9(b) requires that fraud be alleged with particularity . . . insist[ing] there is evidence of fraud in there, somewhere, while completely failing to identify" the fraudulent activity is not enough under Rule 9(b). *Id.* Should this case move forward, it will bear the unique distinction of being the first FCA upcoding case to reach discovery without pleading any particular fraudulent activity.

The case law concerning FCA claims of upcoding is strikingly clear on this point. Beginning with the Fifth Circuit, the following cases emphasize Federal Courts' "force[ful], without apology" adherence to the requirement that Relator must plead operative facts of the

fraudulent upcoding scheme alleged. *Williams*, 112 F.3d at 178.

- *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745 (S.D. Tex. 2010): Relators alleged "Medtronic instructed hospitals and physicians to 'upcode' stand-alone surgical ablations." *Id.* at 781. "[B]ecause there was an economic incentive to 'upcode,' because Medtronic pointed out the opportunity to do so, and because stand-alone ablation procedures were performed," Relators argued they had "alleged a sufficient basis to support an inference that Medtronic caused hospitals to 'upcode.'" *Id.* The court dismissed, finding that "relators have not identified any Medtronic sales representative or employee who encouraged hospitals or physicians to 'upcode' improperly or any hospital or physician who did in fact 'upcode' improperly in a Medicare reimbursement submission." *Id.* Further, regarding the probative weight of pleading "incentives" under Medicare's Prospective Payment System ("PPS") the court wrote:

    > The allegation that Medtronic encouraged hospitals to use [its product to perform 'high profit margin' procedures] in part because of the opportunity to profit . . . ***does not create a reasonable inference*** that physicians and hospitals knowingly submitted false claims.

    *Id.* at 783 (emphasis added). The court found the complaint failed to state a claim for relief on those grounds. *Id.*

- *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709 (N.D. Tex. 2011): Regarding the "who, what, when, where, and how" requirement of Rule 9(b), Relator's amended complaint provided:

    o initials of patients and dates on which the patients improperly received hospice care ("'when'"), *id.* at 716; and

    o multiple ways in which "VistaCare" perpetrated the alleged fraud was perpetrated e.g., "that 'VistaCare' tried to persuade non-physicians to improperly certify patients; that 'VistaCare' forged signatures of physicians; that VistaCare 'shopped around' for doctors who were willing to certify patients not qualified for hospice care, and pressured them to do so; and that 'VistaCare' kept changing diagnoses" ("'how'").

    *Id.* (quotations in original). The dismissed the suit anyway, finding Relator failed to specifically plead:

    o the facilities to which the patients had been improperly admitted – VistaCare had multiple locations ("'where'"), *id.*;

    o any individuals who participated in the alleged fraud ("'who'"), *id.*;

    o that persons purposefully acting for VistaCare acted with the requisite intent in making false statements or preparing false records to obtain reimbursement ("'what'"), *id.*; or

    o whether the hospice patients identified, in fact have Medicare or Medicaid

("'what'"), *id.*

The court explained the dismissal:

> Defendants are entitled to a pleading which specifies the manner in which "VistaCare" allegedly instructed its employees to falsify certifications for specific individual patients, that those employees did so with the requisite intent, that named individuals acting for VistaCare asked other named individuals to forge doctors' names for specific individuals, and that they did so.

*Id.* at 717.

- *U.S. ex rel. Walker v. Corp. Mgmt., Inc.*, No. 2:07-CV-342-KS-MTP, 2012 WL 5287065 (S.D. Miss. Oct. 24, 2012): Relators alleged they witnessed defendants "engage[] in a pattern of 'upcoding'" by submitting "claims for two beds at the same time for the same patients" and by "ke[eping] a bed open in the assisted living section of the facility with a patient's charts, while the patient was actually housed in the inpatient rehabilitative section of the facility." *Id.* at *2. Relators provided names of specific physicians, specific patients and specific dates of not-provided and unnecessary treatment and subsequent false claims. *Id.* The court denied dismissal because relators provided "***details of fraudulent activity***" in satisfaction of Rule 9(b). *Id.* at *3 (emphasis added).

- *Corsello v. Lincare, Inc.*, 428 F.3d 1008 (11th Cir. 2005): Relator alleged defendants were "billing for unnecessary or non-existent treatment to obtain Medicare payments unlawfully" and offered "many details of numerous schemes, employees, and claims," including "the initials of patients whose Medicare forms were improperly completed." *Id.* at 1011, 1013. Relator argued that defendants' "pattern of improper practices" sufficiently raised the inference that defendants engaged in fraudulent activity. *Id.* at 1014. The court affirmed dismissal per Rule 9(b) because "[u]nderlying improper practices alone are insufficient to state a claim under the [FCA] . . . [relator] failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions" arising from the "improper practices." *Id.* at 1014.

- *U.S. ex rel. Atkins,* 470 F.3d 1350: Relator "described in detail" what he believed to be "an elaborate scheme for defrauding the government," including examples of "particular patients, dates and corresponding medical records for services that he contend[ed] were not eligible for government reimbursement." *Id.* at 1359. The court found relator's allegations deficient because they (1) "fail[ed] to provide the next link in the FCA liability chain: showing that the defendants actually submitted claims . . . for the [fraudulent] services," and (ii) "swep[t] with a much broader brush by naming as defendants [skilled nursing facilities] into which [relator] never stepped foot." *Id.*

- *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007): Relator identified specific codes that defendants wrongly used to bill the government for certain ventilation services, procedures and supplies, and described schemes involving "exaggerating the length of a properly-billed treatment" and "charg[ing] separately for services that should otherwise have been billed jointly." *Id.* The court upheld dismissal of "miscoding and upcoding" allegations because "no employee was named as a

participant," "there were no allegations of when such fraud allegedly occurred" and there was no "allegation that any particular claim was submitted pursuant to these allegedly fraudulent schemes." *Id.*

- *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. 2016): Relator pleaded "clear[] and specific[ facts] that [defendant] provided non-psychiatric evaluations and then falsely presented those services as psychiatric evaluations on bills to the state and federal governments." *Id.* at 778. The court reversed dismissal on those claims. Relator also alleged fraud based on defendant's policies and treatment practices. *Id.* at 780. The court upheld dismissal of those claims, as those "allegations depend[ed] entirely on [relator's] personal estimation . . . [and] subjective evaluation." *Id.* at 780, 781.

- *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 920 (8th Cir. 2014): Relator alleged defendant scheduled high volumes of patient appointments in short time windows, then used "problem codes" to bill for services not performed as physicians "would usually only briefly look into the [patient's] room from the hallway" or never "see the [patient]." *Id.* at 920. The court affirmed dismissal. The court found these allegations "conclusory and generalized . . . [and failed to] allege when or how often upcoding took place at the various clinics, who or how many physicians engaged in upcoding, or what types of services were involved in the upcoding scheme." *Id.*

- *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1 (D.D.C. 2003): the government named defendants individually, identified the time period and location of the fraud, and provided "evidence in 12 patient files indicat[ing] a discrepancy between the reported treatment and the actual treatment administered by the defendants." *Id.* at 8–9. The court denied dismissal because the government satisfied Rule 9(b) by particularly describing "the defendants' scheme to falsify claims or submit claims based on false records by creating fee tickets that only allowed CPT codes at Level III or higher and by upcoding." *Id.* at 8.

Here, Relator pleads limited, unsourced "facts" regarding the BSW Defendants' CDI program and no facts regarding the alleged fraudulent upcoding scheme. Its pleadings fail to "provide the next link in the FCA liability chain:" demonstrating that a fraud was actually committed. *U.S. ex rel. Atkins*, 470 F.3d at 1359. Relator attempts to characterize the BSW Defendants' CDI program as a "pattern of improper practices" (or, in Relator's terms, a "culture of non-compliance," SAC ¶ 20) and asks the court to draw an unreasonable inference of fraud. *Corsello*, 428 F.3d at 1013. While failing to plead any facts that show the fraud in action, Integra concludes that some fraud ***must*** have happened. That will not suffice.

Nowhere in the SAC does Relator allege any specific instances of 1) physicians

documenting inaccurate diagnoses that were coded and submitted for reimbursement (much less the identities of any physicians), 2) coders upcoding accurate diagnoses, or 3) anyone submitting anything improper for reimbursement. In fact, Relator fails to plead a single, objective fact operative of any of the fraud it believes happened. Nowhere does Relator plead that BSW Defendants submitted claims with MCCs for treatments not actually performed nor for diagnoses not appropriately made. Relator's leap to generalized conclusions is insufficient, unparticular and unfair. The case law is unwavering: these operative facts must be pled to satisfy Rule 9(b).[3]

### b. Opinions About Data Are Not Accepted Alternatives to Particularly Pleaded Fraudulent Behavior

The Fifth Circuit does not provide a shortcut from the path to discovery for *qui tam* relators who bring FCA actions centered on subjective opinions on data instead of objective examples of actual fraudulent activity. *U.S. ex rel. Thompson*, 125 F.3d at 903 (affirming district court's dismissal of FCA claim for failure to satisfy Rule 9(b) because relator "provided no factual basis for his belief that defendants submitted claims for medically unnecessary services other than his reference to statistical studies").

### 2. Relator Fails to Plead a Facially Plausible Claim for Violation of the False Claims Act: Rule 8(a)

The SAC can independently be dismissed on the basis that it fails to satisfy Rule 8(a)'s plausibility requirements. Relator forms opinions about the publicly-disclosed data and concludes that "the only plausible explanation is . . . fraudulent[] upcoding." SAC ¶ 103. Saying this does not make it so. The SAC must allege ***facially plausible*** fraudulent upcoding. Here, such a pleading would include particularized facts indicating at least one instance of miscoding a diagnosis or

---

[3] Moreover, even if Relators had identified a particular case of a particular diagnosis with which it disagreed, Federal Courts agree that medical diagnoses are "[e]xpressions of opinion of scientific judgments about which reasonable minds may differ." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Importantly, "opinion[s] cannot be 'false' for purposes of the FCA" because "a lie is actionable but not an error." *Id.* at 374, 376.

changing a diagnosis through the CDI program and the submission of upcoded claims to Medicare. Instead, the factual allegations are vague and benign. The balance of the SAC never rises above "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp.*, 550 U.S. at 555.

Further, although Relator may believe that its pleaded facts are consistent with a fraudulent scheme, factual allegations that are "merely consistent with" an alleged unlawful scheme nevertheless "stop[] short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atlantic Corp.*, 550 U.S. at 557). Integra must instead plead facts that plausibly preclude any "more likely" lawful explanation consistent with the BSW Defendants' alleged conduct. *Ashcroft*, 556 U.S. at 680 (citing *Bell Atlantic Corp.*, 550 U.S. at 567); *see United States v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 598 (S.D. Tex. 2018) (since the behavior alleged by the well-pleaded facts "was legitimate, it renders implausible Relators' assertions that Defendants" violated the FCA).

*Qui tam* plaintiffs are incentivized to ignore blindingly obvious and innocuous facts and blindly embrace any explanation that sounds in fraud. The ultimate payout for Relator's "robust and conservative" view of the plain facts depends on it, and their massive, settlement-inducing bargaining power perpetuates it. SAC ¶ 104. Nonetheless, putting aside Relator's characterizations, as required by Rule 8(a), *Bell Atl. Corp.,* and *Ashcroft,* and focusing just on the handful of actual facts pleaded, it is obvious that something is missing: the particular, factual details of a multi-year, multi-hospital alleged fraud, or at least any facts sufficient to support more than speculation that an alleged fraud may have occurred.

In reaching their spurious conclusion that there was a fraudulent scheme, Relator hastily overlooks the more obvious conclusion: that the well-pleaded facts actually describe explicitly legal behavior (*e.g.*, the existence of Baylor's CDI program, the training of medical coders and

physicians with respect to clinical documentation, and the submission of certain secondary diagnosis codes in certain of Baylor's claims). In fact, CDI programs and their requisite training of both medical coders and physicians, such as that described in the SAC, actually represent the "joint effort between the healthcare provider and the coder [that] is essential to achieve complete and accurate documentation, code assignment, and reporting of diagnoses and procedures," a "joint effort" that is expressly contemplated by the Centers for Medicare and Medicaid (CMS) in its Official ICD-9-CM Guidelines for Coding and Reporting.[4] In other words, the facts demonstrate behavior "not only compatible with," but "more likely explained by" lawful conduct. *Ashcroft*, 556 U.S. at 680 (quoting *Bell Atlantic Corp.*, 550 U.S. at 570). Only characterizations and conclusions support Relator's fraud claim; the well-pleaded facts do not, and the SAC should be dismissed.

### C. <u>Dismissal Should be With Prejudice</u>

Leave to amend is not automatic, but rather "is within the sound discretion of the district court." *U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) (citation omitted). Relator already has been given two opportunities to amend its pleadings and has still failed to state a claim for relief. There is no reason to believe Relator would have more to offer given a third go round. Leave to amend may be denied where, as here, the party seeking leave has repeatedly failed to cure deficiencies by amendments previously allowed and when amendment would be futile. *See U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (district court's denial of leave to file a third amended complaint was not an abuse of discretion).

## V. <u>CONCLUSION</u>

The BSW Defendants' motion to dismiss should be granted with prejudice.

---

[4] SAC fn. 3*, citing to* Centers for Disease Control, ICD-9-CM Official Guidelines for Coding and Reporting, Oct. 1, 2011 at 88, available at https://goo.gl/DC55Wx.

Dated:  October 23, 2018

Respectfully submitted,

*/s/ R. Jeffrey Layne*
R. Jeffrey Layne
Texas Bar No. 00791083
REED SMITH LLP
111 Congress Avenue, Suite 400
Austin, TX 78701
Tel: (512) 623-1821
Fax: (512) 623-1802
*jlayne@reedsmith.com*

*Counsel for Defendants Baylor Scott & White*
*Health, Baylor University Medical Center –*
*Dallas, Hillcrest Baptist Medical Center,*
*Scott & White Hospital – Round Rock, and*
*Scott & White Memorial Hospital – Temple*

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that the following counsel of record were served via the CM/ECF system of the United States District Court for the Western District of Texas on October 23, 2018.

Jeremy H. Wells
Reid Collins and Tsai LLP
1301 S Capital of Texas Hwy
Suite C-300
Austin, TX 78746
512-647-6100
Fax: 512-647-6129
Email: jwells@rctlegal.com
*Counsel for Relator*

P. Jason Collins
Reid Collins & Tsai LLP
1301 S. Capital of Texas Hwy.
Building C, Suite 300
Austin, TX 78746
512-647-6100
*Counsel for Relator*

Scotty G. Arbuckle , III
Reid Collins & Tsai LLP
1301 S Capital of Texas Hwy Bldg., Ste 300
Austin, TX 78746
512-647-6100
Fax: 512-647-6129
Email: tarbuckle@rctlegal.com
*Counsel for Relator*

Erica Benites Giese
U.S. Attorney's Office
601 NW Loop 410
Suite 600
San Antonio, TX 78216
(210) 384-7150
Fax: (210) 384-7118
Email: erica.giese@usdoj.gov
*Counsel for the United States*

Susan Leslie Strawn
United States Attorney's Office
601 NW Loop 410 - Ste 600
San Antonio, TX 78216
(210) 384-7388
Fax: 210/384-7322
Email: susan.strawn@usdoj.gov
*Counsel for the United States*

*/s/ R. Jeffrey Layne*
R. Jeffrey Layne