P. Jason Collins (TX Bar No. 24040711)
jcollins@rctlegal.com
Jeremy H. Wells (TX Bar No. 24098805)
jwells@rctlegal.com
Scotty G. Arbuckle, III (TX Bar No. 24089969)
tarbuckle@rctlegal.com
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy., Suite C300
Austin, TX 78746
T: 512.647.6100
F: 512.647.6129

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* INTEGRA MED ANALYTICS LLC, <br><br>     Plaintiff, <br><br> v. <br><br> 1. BAYLOR SCOTT & WHITE HEALTH, <br> 2. BAYLOR UNIVERSITY MEDICAL CENTER – DALLAS, <br> 3. HILLCREST BAPTIST MEDICAL CENTER, <br> 4. SCOTT & WHITE HOSPITAL – ROUND ROCK, <br> 5. SCOTT & WHITE MEMORIAL HOSPITAL – TEMPLE <br><br>     Defendants. | Case No.: 17-CV-0886-DAE |

## INTEGRA MED ANALYTICS LLC'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

I.      INTRODUCTION ....................................................................................... 1

II.     FACTUAL BACKGROUND ....................................................................... 3

        A.      Defendants promoted a culture of noncompliant Medicare coding. ...................... 3

                1.      Defendants trained doctors and CDI staff to aggressively document MCCs. ......................................................................... 4

                2.      Defendants pressured doctors to change their diagnoses. ........................... 5

                3.      Defendants provided unnecessary treatment, which enabled it to code MCCs .............................................................................. 6

        B.      Integra's quantitative, statistical, and econometric analyses reliably indicates that Defendants successfully carried out their upcoding scheme. ........... 7

III.    ARGUMENT .............................................................................................. 9

        A.      The FCA's public disclosure bar does not apply to this case. ............................... 9

                1.      CMS did not publicly disclose its confidential claims data. ..................... 10

                2.      CMS data does not constitute "substantially the same allegations or transactions" as alleged in the Complaint ............................................ 11

                3.      Integra qualifies as an "original source" under the FCA. ......................... 14

        B.      Integra's allegations state a claim under Rule 12(b)(6). ...................................... 15

                1.      Integra alleges Defendants' upcoding scheme in detail ............................ 16

                2.      Integra's quantitative, statistical, and econometric analyses provide a reliable inference that Defendants carried out their scheme as alleged. ............................................................................... 18

        C.      The allegations of Defendants' scheme are more than "plausible." ..................... 20

IV.     CONCLUSION ........................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ................................................................................................ 20

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ................................................................................................ 20

*Corsello v. Lincare, Inc.*
    428 F.3d 1008 (11th Cir. 2005) ............................................................................. 18

*Little v. Shell Expl. & Prod. Co.*
    690 F.3d 282 (5th Cir. 2012) ................................................................................. 12

*Lormand v. U.S. Unwired, Inc.*
    565 F.3d 228 (5th Cir. 2009) ................................................................................. 16

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*
    563 U.S. 401 (2011) ............................................................................................... 11

*U.S. ex rel Spay v. CVS Caremark Corp.*
    Case No. 09-4672, 2012 WL 11945256 (E.D. Pa. Sept. 10, 2012) ......................... 11

*U.S. ex rel. Bennett v. Medtronic, Inc.*
    747 F. Supp. 2d 745 (S.D. Tex. 2010) ................................................................... 18

*U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*
    560 F.3d 371 (5th Cir. 2009) ................................................................................. 13

*U.S. ex rel. Colquitt v. Abbott Labs.*
    858 F.3d 365 (5th Cir. 2017) ................................................................................. 13

*U.S. ex rel. Conrad v. Abbott Labs, Inc.*
    No. CIV.A. 02-11738-RWZ, 2013 WL 682740 (D. Mass. Feb. 25, 2013) ............... 11

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*
    839 F.3d 242 (3d Cir. 2016) ............................................................................ 19, 20

*U.S. ex rel. Duxbury v. Ortho Biotech Prod., L.P.*
    579 F.3d 13 (1st Cir. 2009) ................................................................................... 19

*U.S. ex rel. Grubbs v. Kanneganti*
    565 F.3d 180 (5th Cir. 2009) ........................................................................ passim

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*
    760 F.3d 688 (7th Cir. 2014) ................................................................................. 12

*U.S. ex rel. Lam v. Tenet Healthcare Corp.*
   481 F. Supp. 2d 673 (W.D. Tex. 2006) ................................................................. 15

*U.S. ex rel. Spay v. CVS Caremark Corp.*
   913 F. Supp. 2d 125 (E.D. Pa. 2012) .................................................................. 11

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*
   14 F.3d 645 (D.C. Cir. 1994) ......................................................................... 13, 15

*U.S. ex rel. Walker v. Corporate Mgmt., Inc.*
   No. 2:07-cv-342-KS-MTP, 2012 WL 5287065 (S.D. Miss. Oct. 24, 2012) ............................ 18

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*
   778 F. Supp. 2d 709 (N.D. Tex. 2011) ................................................................ 18

**Rules**

Fed. R. Civ. P. 8(a) .................................................................................. 20

Fed. R. Civ. P. 9(b) .................................................................................. 16

Fed. R. Civ. P. 12(b)(6) .............................................................................. 16

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ......................................................................... 15, 17

31 U.S.C. § 3729(a)(1)(B) ......................................................................... 15, 18

31 U.S.C. § 3729(a)(1)(G) ......................................................................... 15, 18

31 U.S.C. § 3729(b)(1) ................................................................................ 15

31 U.S.C. § 3730(b)(4) (1982) .......................................................................... 9

31 U.S.C. § 3730(e)(4)(A) ...................................................................... 10, 11, 14

31 U.S.C. § 3730(e)(4)(B) .......................................................................... 10, 14

42 U.S.C. § 1320a-7k .................................................................................. 18

iv

**Other Authorities**

145 Cong. Rec. E1546-01
   1999 WL 495861 (remarks of Hon. Howard L. Berman and Charles E. Grassley) ............ 9, 14

153 Cong. Rec. S11506-01
   2007 WL 2668973 (Remarks of Hon. Richard J. Durbin) .......................................................... 9

CMS Cell Size Suppression Policy
   May 8, 2017, *available at* https://goo.gl/rkCfzZ ..................................................................... 10

Relator Integra Med Analytics LLC ("**Integra**") opposes the motion ("**Motion**") filed by defendant Baylor Scott & White Health and its affiliated entities ("**Defendants**"). Defendants seek dismissal of Integra's Second Amended Complaint ("**Complaint**" or "**SAC**"), which brings claims under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729–33 (the "**FCA**").

## I.    INTRODUCTION

Through its multi-faceted investigation, Integra uncovered that Defendants systematically inflated reimbursement claims submitted to Medicare through a practice known as "upcoding." Contrary to the Motion, these allegations are pleaded in extensive detail, based on non-public documents, and confirmed with exhaustive quantitative, statistical, and econometric analyses. The Motion should thus be denied.

To protect their ill-gotten gains, Defendants either mischaracterize Integra's allegations or pretend as though they do not exist—perhaps hoping the Court and others will not focus on their looting of critical government programs. In fact, not once does the Motion discuss the damning documents cited in the Complaint. Defendants instead believe that a misplaced, *ad hominem* screed (the classic mantra whereby fraudsters attempt to label their whistleblowers as parasites) along with a strawman attack on a counterfactual version of the Complaint will be sufficient to win the day. In case that is not enough, Defendants throw in a misrepresentation of the law interpreting Rule 9(b) by misciting a dissenting opinion in a case that supports Integra. In view of the actual complaint and truly applicable law, Defendants' Motion fails.

At bottom, Defendants ask this Court to give fraudsters two novel protections from whistleblowers like Integra. First, Defendants seek an unprecedented expansion of the FCA's "public disclosure" bar, which is designed only to prevent relators from copying and pasting publicly disclosed information into an FCA complaint. The Defendants argue that the Centers for

1

Medicare & Medicaid Services ("**CMS**") publicly disclosed its confidential Medicare claims data by providing it to researchers like Integra under strict privacy protections. Taken to its logical conclusion, this argument would mandate that everything the government has in its files is public information—a result that would frustrate the intent of the FCA to allow relators to prosecute claims that the government doesn't have the resources or knowledge to pursue. Not surprisingly, this expansive interpretation of the public disclosure bar has been rejected not only by each court to have considered it, but also the drafters of the FCA and the government itself.

In any event, Integra did not base the Complaint's allegations on a simple review of CMS data. Instead, Integra employed unique quantitative, statistical, and econometric analyses to demonstrate fraudulent patterns. Moreover, Integra analyzed not only CMS data, but a host of data from an array of sources. Integra also conducted an extensive traditional investigation that uncovered non-public training materials and information gleaned from interviews of Defendants' former employees. Tellingly, Defendants barely mention the allegations based on these materials and interviews. In sum, the Complaint adds to what can be learned from simply consulting raw CMS data, and without Integra's efforts, the government could not prove Defendants' fraud. Integra is thus an "original source" under the FCA, and not subject to its public disclosure bar.

Second, Defendants press for a strict pleading standard for FCA claims that the Fifth Circuit has already considered and rejected. In this circuit, an FCA relator need only plead the details of a scheme to submit false claims, together with reliable indicia that the scheme has been carried out. The Complaint pleads extensive details about Defendants' upcoding scheme, identifies the primary executive that promoted the scheme throughout the hospital system, and cites Defendants' own training materials and information learned from Defendants' former employees. The Complaint then sets out Integra's analyses, which reliably indicate the scope of

2

the Defendants' scheme while eliminating conceivable innocent explanations. Defendants do not even bother to impeach this analysis, nor could they.

## II.   FACTUAL BACKGROUND

### A.   Defendants promoted a culture of noncompliant Medicare coding.

To establish the amount of a Medicare claim, hospitals must accurately code the services provided to the patient. Medicare then assigns the patient's claim to a diagnosis related group ("**DRG**"), which groups claims that are expected to require similar amounts of resources. (SAC ¶ 17.) The DRG is primarily determined by the provider-assigned principal diagnosis codes, surgical procedure codes, and secondary diagnosis codes. (*Id.* ¶ 18.) CMS publishes a list of secondary codes each year that, when added to a claim, result in that claim being considered a Complication or Comorbidity (a "**CC**") or Major Complication or Comorbidity (an "**MCC**"). (*Id.* ¶ 19.) Adding a CC secondary code can increase the value of a claim by $1,000–$10,000. Adding an MCC secondary code increases the value by $1,000–$25,000.

Like most hospital groups, Defendants have a system-wide clinical documentation improvement ("**CDI**") program. (*Id.* ¶ 20.) These programs are usually designed to promote accurate documentation and coding of a patient's diagnosis. (*Id.*) Under the leadership of Vice President Anthony Matejicka, however, Defendants' CDI program was singularly focused on inflating Defendants' Medicare revenue through upcoding claims with unwarranted CCs and MCCs. (*See id.* ¶ 20.) These efforts pervaded every level of Defendants' CDI program, beginning with training doctors and staff to focus on documenting diagnoses that allow MCCs. (*Id.* ¶¶ 23–26.) When doctors failed to diagnose an MCC, Defendants' CDI specialists pressed doctors to change their original diagnoses. (*Id.* ¶¶ 27–36.) Defendants even routinely offered unnecessary medical services to allow for the coding of profitable MCCs. (*See id.* ¶¶ 20–39.)

3

### 1.    Defendants trained doctors and CDI staff to aggressively document MCCs.

Matejicka spearheaded Defendants' efforts to focus doctors and CDI staff on coding for MCCs. Two of Defendants' former employees confirmed to Integra that Matejicka personally trained employees on key words to increase Medicare reimbursements, noting that doctors and staff received a list of MCCs to focus on. (*Id.* ¶ 23.) Defendants made clear to their doctors how important coding MCCs was to the Defendants' bottom line and quality metrics. (*Id.* ¶ 24.) In an internal August 2012 presentation to doctors titled "Fundamentals of Hospital Medicine: What No One Taught Us!"—which Integra uncovered in its investigation—Matejicka encouraged doctors to use what he referred to as "magic words" that "provide triggers for reimbursement." (*Id.*) The "magic words" described in the presentation included "encephalopathy" and "acute respiratory failure," two MCCs that Integra identifies as being misapplied by Defendants. (*Id.*) Matejicka encouraged doctors to use these words notwithstanding their clinical propriety, arguing that "Coding Language Trumps Clinical Terminology." (*Id.*)

Matejicka also emphasized that his coding guidelines would increase doctors' salaries, stating "Your hospital data will determine your income!" (*Id.* ¶ 25.) He then closed his presentation by asking, "Do you want to 'see one more patient' or take one minute to improve your documentation ???," suggesting that using his "magic words" would generate equivalent revenue to seeing an additional patient. (*Id.*) The presentation even described an example where adding an MCC would both increase hospital reimbursement by $8,444.94 as well as improve so-called "pay for performance" metrics for doctors, resulting in "SO MUCH WIN." (*Id.* ¶ 25.)

Matejicka's program openly steered doctors away from non-MCC diagnoses toward specific, higher-paying MCCs. Defendants provided doctors with tip sheets that pushed doctors to clinically document patient services in a way that maximizes Medicare revenue. (*Id.* ¶ 26.) For instance, in training doctors how to document altered mental status ("**AMS**"), Defendants

encouraged them to diagnose encephalopathy (an MCC) or acute delirium (a CC), explaining that this allowed coders to increase the patient's "severity of illness" and thus Medicare reimbursement. Defendants blithely added that "there are Other causes of AMS, too ☺." (*Id.*)

After Matejicka left in 2014, the rate of Defendants' misuse of MCCs declined slightly. (*Id.* ¶ 22.) But coders soon began to receive pressure directly from Defendants' Health Information Management Department ("**HIM**") to continue coding unethically. According to a former medical coder interviewed by Integra, Defendants' HIM Department directed her coding supervisor to apply unnecessary coding to increase revenue. (*Id.*) The medical coder eventually quit because she "was continually getting directives to compromise her integrity." (*Id.*)

### 2. Defendants pressured doctors to change their diagnoses.

If a Defendant's doctor ignored their training and issued an initial diagnosis that did not call for a CC or MCC, Defendants' CDI staff were trained to send the doctor a leading "query" encouraging doctors to amend the original diagnosis. (*Id.* ¶ 27.) Defendants' queries would ask doctors to "specify" their diagnoses, suggesting either specific revenue-increasing CCs or MCCs or provide options listing several possible CCs and MCCs—often including conditions wholly unrelated to the patient's principal diagnosis. (*Id.*)

Through its investigation, Integra obtained "documentation clarification sheets" used by Defendants' CDI staff to query physicians for additional documentation. (*Id.* ¶ 28.) These sheets betray a clear intent to influence doctors to code CCs and MCCs. For instance, in the AMS query sheet, doctors are asked to document the underlying cause, but are only provided with options yielding a CC or MCC. (*Id.*) There are, of course, many other common causes for AMS that do not yield an CC or MCC. (*Id.* ¶ 29.) Defendants' clarification sheets for "Diseases of the Respiratory System" and the tip sheet for comorbidities are similarly biased. (*Id.* ¶¶ 30–31.)

Defendants also prompted doctors to document CCs and MCCs with post-surgery progress notes that encouraged particularly uncommon pairings. (*Id.* ¶ 32.) For instance, in progress notes for plastic surgery patients, Defendants gave doctors a multiple-choice option to include severe protein calorie malnutrition. (*Id.*) Integra's analysis shows that the Defendants' rate of severe protein malnutrition in plastic surgery claims dwarfs the national rate. A staggering 6.56% of the plastic surgery patients treated by three Defendant hospitals were assigned severe protein-calorie malnutrition—over 8 times the national average. (*Id.* ¶¶ 33–34.)

As one former coder described, the Defendants' CDI staff were effectively "trained in sales" in order to convince doctors to change their clinical documentation in inappropriate ways. (*Id.* ¶ 34.) According to another of Defendants' former coding and compliance staff members, CDIs pressured doctors to record MCCs in an effort to increase revenue. For example, CDIs influenced doctors to record "acute respiratory failure" (an MCC identified by Integra for excessive use) instead of COPD exacerbation because that is what "[CDIs] want to hear…doctors have been told and told and told so they do." (*Id.* ¶ 36.) The staff member added, "CDIs should be questioning acute respiratory failure instead of insisting [on it]." (*Id.*)

### 3.   Defendants provided unnecessary treatment, which enabled it to code MCCs.

Integra also uncovered that Defendants excessively kept post-operative patients on ventilator support, one of the clinical indicators for "acute respiratory failure." (*Id.* ¶ 37.) Integra found that Defendants' patients undergoing major heart surgery were placed on mechanical ventilation over twice the national average. (*Id.*) Correspondingly, for post-operative heart surgery patients Defendants coded acute respiratory failure (not present on admission) at 36.9% which is 2.75 times higher than the national average of 13.4%. (*Id.*)

Post-operative respiratory failure is extremely rare. One CDI expert notes that "patients being purposely maintained on the ventilator after heart surgery or any surgery because of

weakness, chronic lung disease, massive trauma are NOT in acute respiratory failure." (*Id.* ¶ 38.) However, diagnosing post-operative acute respiratory failure can lead to large increases in reimbursement. According to another CDI expert, "'Postop' respiratory failure is classified as one of the most severe, life-threatening reportable surgical complications a patient can have. The diagnosis of respiratory failure following surgery often results in a huge payment increase to the hospital—sometimes $20,000 to $30,000 or even more." (*Id.*)

In spite of the high bar for accurately coding acute respiratory failure, Integra's analysis shows that Defendants were liberal in its application. In Defendants' documentation clarification sheet for "Diseases for the Respiratory System," Defendants' doctors were told that "the use of artificial ventilation such as BiPAP would also qualify" for diagnosing acute respiratory failure. (*Id.* ¶ 39.) In other words, Defendants trained their staff to code acute respiratory failure based on the use of a ventilator, even if clinical indicators suggested otherwise. (*Id.*)

**B.  Integra's quantitative, statistical, and econometric analyses reliably indicate that Defendants successfully carried out their upcoding scheme.**

Integra developed unique algorithms and statistical processes to analyze inpatient CMS claims for short term acute care hospitals from 2011 to 2017. These methods—which included studying CMS claims data, together with numerous other sources of data—allowed Integra to identify the specific false claims stemming from Defendants' pervasive upcoding. (*Id.* ¶¶ 40–68.)

Integra first formed groupings corresponding to 184 specific principal diagnosis codes. To control for the patient's principal diagnosis, Integra used these groupings as comparative "bins." (*Id.* ¶ 41.) Within each bin, Integra compared the usage rate of specific MCCs at hospitals in the Defendants' system to usage rates in other acute care inpatient hospitals. (*Id.*) Given that some natural variation in usage rates among hospitals is expected, Integra validated the results of its analysis by determining each pattern's statistical significance. Integra used claim groupings

only if there was less than a 1 in 1,000 possibility of Integra's findings being due to chance. (*Id.* ¶ 42.) Indeed, Integra found that the majority of groupings it identified had less than 1 in 1,000,000 possibility of being due to chance. (*Id.*, Fig. 11.)

For example, among Defendants' more than 838 claims involving a principal diagnosis of Nonrheumatic Aortic Valve Disorder, 59 (or 7.04%) had an accompanying secondary MCC of encephalopathy. Non-defendant hospitals around the country, by contrast, had more than 200,000 Nonrheumatic Aortic Valve Disorders claims, but only 2.67 percent of those claims reported encephalopathy as an MCC. In other words, Defendants coded encephalopathy on these claims at a rate that is 2.64 times higher than comparable hospitals—and profited nearly $13,000 each time it did so. (*Id.* ¶ 43.) The Complaint sets out in great detail the same analysis for 209 combinations of principal diagnoses and misstated MCCs for which the Defendants excessively coded three MCCs, including encephalopathy (*id.* ¶¶ 49–55), respiratory failure (*id.* ¶¶ 56–62), and severe malnutrition (*id.* ¶¶ 63–68).

To validate the results of its bin-based analysis, Integra ran an extensive fixed-effect linear regression model to control for potentially innocent explanations. (*Id.* ¶¶ 69–102.) Integra sought out data from numerous sources, which it used to tailor separate regressions to control for an array of patient characteristics such as age, gender, and race, as well as county demographic factors such as unemployment rate, median income, urban-rural differences, length of stay, and discharge status. (*Id.* ¶ 70.) Integra even controlled for the potential impact that specific doctors, individual patients, and a hospital's region could have on MCC rates. (*Id.* ¶¶ 82–102.)

The results of Integra's analyses are astounding and confirm that Defendants' scheme inflated revenue received from Medicare. Integra has calculated that Defendants received an unwarranted $61.8 million in false claims across all principal diagnoses categories. (*Id.* ¶ 106.)

### III.   <u>ARGUMENT</u>

Defendants make three unavailing arguments to support their Motion, each of which would distort the FCA beyond all recognition as a tool to fight public fraud. <u>First</u>, Defendants suggest that the FCA's public disclosure bar applies to the Complaint, notwithstanding there has been no public disclosure of any of the evidence on which the Complaint is based. <u>Second</u>, Defendants argue that Integra has not pleaded its claims with sufficient particularity, even though the Complaint contains extensive allegations of Defendants' upcoding scheme coupled with exhaustive quantitative, statistical, and econometric analyses confirming the scheme was carried out to great effect. <u>Third</u>, Defendants argue that Integra's allegations of upcoding—which Integra demonstrates with mathematical precision—are nevertheless facially implausible.

**A.     The FCA's public disclosure bar does not apply to this case.**

Until 1986, the FCA barred all relator claims based on information in the government's possession. 31 U.S.C. § 3730(b)(4) (1982) (superseded). Congress narrowed the scope of this sweeping limitation to prevent dismissal of meritorious relator claims because "information about fraud was in a file somewhere in the vast federal bureaucracy." 145 Cong. Rec. E1546-01, E1546, 1999 WL 495861 (remarks of Hon. Howard L. Berman and Charles E. Grassley).[1] The result of these changes was the public disclosure bar, designed to prevent relators from "merely repackage[ing] allegations [that the government] can be presumed to already know about[.]" *Id.* In its current form, the public disclosure bar applies only if each of three elements are met: (i) there was a public disclosure (ii) of "substantially the same allegations or transactions as alleged

---

[1] Senator Grassley is regarded as "the Senate architect of the 1986 FCA amendments," which first introduced the public disclosure bar. 153 Cong. Rec. S11506-01, S11510, 2007 WL 2668973 (Remarks of Hon. Richard J. Durbin).

in the action," and (iii) the relator is not an "original source" of the allegations or transactions. 31 U.S.C. § 3730(e)(4)(A)–(B). Defendants cannot even establish one of these elements.

       **1.**       **CMS did not publicly disclose its confidential claims data.**

       In order for the public disclosure bar to apply, Defendants must first identify a public disclosure in a source enumerated by the FCA. *See* 31 U.S.C. § 3730(e)(4)(A)(i)–(iii). Defendants point only to CMS claims data, one of several sources of raw data utilized to perform Integra's analyses. Defendants suggest that CMS issues a public "Federal report" every time it provides raw data to researchers with strict controls over its public disclosure. Defendants offer no support for this proposition, and the only cases that touch on the issue—which Defendants do not discuss in their Motion—squarely reject the Defendants' premise.

       CMS releases limited claims data to researchers like Integra upon demonstration that the researcher intends to "improve the quality of life for Medicare beneficiaries or improve the administration of the Medicare program." Instructions for Completing the Limited Data Set Data Use Agreement, Form No. CMS R-0235L, *available at* https://goo.gl/HJMiro. Recipients of CMS data are required to comply both with the Privacy Act of 1974 (5 U.S.C. § 522a), and the Health Insurance Portability and Accountability Act ("**HIPAA**") Privacy Rule (45 C.F.R. Parts 160 and 164). *Id.* CMS further requires data recipients to adhere to a "cell suppression policy" "aim[ed] to protect the confidentiality of Medicare . . . beneficiaries by avoiding the release of information that can be used to identify individual beneficiaries." CMS Cell Size Suppression Policy, May 8, 2017, *available at* https://goo.gl/rkCfzZ. Notably, Defendants have stipulated in this very case to the confidentiality of the data. See Stipulation to Maintain Confidentiality of the Unredacted Second Amended Complaint Filed Under Seal at 2 [Dkt. No. 18].

       At least one court has directly held that CMS data "release[ed] to certain entities and for certain purposes [. . .] are the antithesis of the 'publicly available' information found to trigger

the public disclosure bar of the FCA." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 184 (E.D. Pa. 2012). According to the government, which filed a Statement of Interest in the *Spay* case, Defendants' proposed interpretation of the public disclosure bar "is tantamount to the claim that everything the government has in its files is public information. . . . Were such an interpretation to be accepted, relators would be seriously handicapped in using the False Claims Act to prosecute fraud on behalf of the United States." *See* Statement of Interest, *U.S. ex rel Spay v. CVS Caremark Corp.*, Case No. 09-4672, 2012 WL 11945256 (E.D. Pa. Sept. 10, 2012).

Defendants do not cite (and Integra has not identified) any case finding that HIPAA-protected CMS data are "publicly available." Instead, Defendants cite *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, which found only that **unprotected** documents attached to a FOIA response have been publicly disclosed. 563 U.S. 401, 416 (2011). The Fifth Circuit has clearly signaled that this holding would not extend to the **protected** data at issue here. *See U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 195 (5th Cir. 2009) ("[W]e doubt whether medical billing information that comprises the crux of the complaint . . . would be available through the FOIA, which excludes 'personnel and medical files . . . the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'"). Defendants also cite *U.S. ex rel. Conrad v. Abbott Labs, Inc.*, 02-11738, 2013 WL 682740, at *5 (D. Mass. Feb. 25, 2013). But unlike the CMS data Integra used as one component of its analyses, the information at issue in *Abbott* was publicly available on CMS's website, not protected by many layers of disclosure regulations. *Id.*

### 2.    CMS data does not constitute "substantially the same allegations or transactions" as alleged in the Complaint.

Even if the Court agrees that CMS publicly disclosed HIPAA-protected claims data, CMS did not disclose "substantially the same allegations or transactions" alleged in the Complaint. 31 U.S.C. § 3730(e)(4)(A). In assessing this element, the Fifth Circuit looks to

"whether 'one could have produced the substance of the complaint merely by synthesizing the public disclosures' description' of a scheme." *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012). Where, as here, the Complaint "offers details about the scheme[,] it is crucial to consider whether the [public] disclosures correspond in scope and breadth." *Id.*

Defendants claim that CMS data is the "alpha and omega" of Integra's case. (Mot. at 10.) In so arguing, Defendants ignore the "beta through psi" of Integra's case: the non-public internal documents, interviews with former employees, and other information gleaned from Integra's comprehensive investigation. (SAC ¶¶ 20–39.) Integra uncovered numerous details about Defendants' scheme, including the identity of the responsible executive (*id.* ¶ 20), the department that took over after that executive left (*id.* ¶ 22), training materials that pushed doctors and CDI staff to upcode (*id.* ¶¶ 24–26), and leading queries recommending doctors change their initial diagnoses to include MCCs (*id.* ¶¶ 27–36). The CMS claims data contains none of these details. As the Fifth Circuit has explained, "[s]tanding alone, raw bills—even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work." *Kanneganti*, 565 F.3d at 190.

Importantly, in deciding whether a public disclosure is substantially the same as information in an FCA complaint, courts also consider whether the public disclosure required further "independent investigation and analysis to reveal any fraudulent behavior." *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014). The relator in *Heath* studied the rates that defendant charged school districts for communication services, compared those rates to the public contract between the defendant and the government, and discovered that the defendant obtained unwarranted federal subsidies. *Id.* at 689. The court found that the public information analyzed by the relator was not substantially similar to the relator's allegations because, "through

his own investigation and initiative, . . . [he] brought 'genuinely new and material information' to the government's attention." *Id.* at 692. Just like the relator in *Heath*, through its "independent investigation and analysis" of information pulled from numerous sources, Integra was able to reveal the Defendants' heretofore undiscovered fraud.

Courts have devised a simple equation to conceptualize whether public disclosures meet the high threshold of "substantially the same allegations or transactions" as alleged in the complaint: $(X + Y) = Z$, where $(X + Y)$ represents the defendant's misrepresentation and the true set of facts—or the "transaction"— from which one can infer $Z$—the "allegation" of fraud. *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653–54 (D.C. Cir. 1994) (adopted in the Fifth Circuit by *U.S. ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 373–74 (5th Cir. 2017)). "Where only one element of the fraudulent transaction is in the public domain (*e.g.*, X), the qui tam plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (*e.g.*, Y) or allegations of fraud itself (*e.g.*, Z)." *Springfield*, 14 F.3d at 655. The CMS claims data, at best, constitutes the Defendants' misrepresentations (or X), which taken by themselves, cannot support an inference of fraud. Integra's investigation sets out both the true set of facts that make up Defendants' fraudulent scheme (Y), as well as investigative efforts demonstrating reliable indicia that their scheme was carried out (Z).

The HHS-OIG report cited by Defendants further underscores this point. (Mot. at 11.) The report broadly addresses an industry-wide issue with one specific billing code, and nowhere mentions Defendants or even the type of scheme detailed in the Complaint. Case law is clear that allegations of "fraud in sources in which [the defendant] was not specifically named or otherwise directly identified are insufficient to trigger" the public disclosure bar. *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 380 (5th Cir. 2009); *U.S. ex rel. Mateski v.*

*Raytheon Co.*, 816 F.3d 565, 571 (9th Cir. 2016) ("Allowing a public document describing 'problems' . . . to bar all FCA suits identifying specific instances of fraud in that project or industry would deprive the Government of information that could lead to recovery[.]")

### 3.     Integra qualifies as an "original source" under the FCA.

Even if Defendants have identified an applicable public disclosure, Integra nevertheless qualifies as an "original source of the information" in the Complaint. 31 U.S.C. § 3730(e)(4)(A). To protect relators from over-application of the public disclosure bar, the 1986 FCA amendments included an exception where the relator is an "original source" of the publicly disclosed allegations or transactions. 31 U.S.C. § 3730(e)(4)(A). To qualify, the relator must have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B). Integra uncovered extensive details about Defendants' upcoding scheme that not only materially add to the information contained in the CMS data, but are necessary to even state a claim for relief against Defendants. *See Kanneganti*, 565 F.3d at 189 (finding that an FCA claim must state the details of an alleged fraudulent scheme).

Integra is also an original source of its quantitative, statistical, and econometric analyses, which both demonstrate Defendants' fraud with mathematical precision and eliminate conceivable innocent explanations, including age, gender, race, unemployment, income, and urban-rural differences. (SAC ¶¶ 46–68, 69–102.) Contrary to Defendants' characterization of Integra as a "parasite," the drafters of the "original source" exception stated expressly that it encompasses instances where "a relator [] learns of false claims by gathering and comparing data[.]" 145 Cong. Rec. E1546-01, E1547, 1999 WL 495861 (remarks of Hon. Howard L. Berman and Charles E. Grassley). "[T]his is especially true where a relator must piece together facts exposing fraud from separate documents." *Id.* Integra's analysis puts together not only CMS data, but a range of other county-level and regional demographic data. (SAC ¶ 70.)

Courts in the Fifth Circuit agree. A relator is an original source where "the investigation or experience of the relator . . . demonstrate[s] a new and undisclosed relationship between disclosed facts, that puts a government agency 'on the trail' of fraud, where that fraud might otherwise go unnoticed." *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 685 (W.D. Tex. 2006);[2] *see also Springfield*, 14 F.3d at 657 (plaintiff was an original source because it "bridged the [factual] gap" in public information "by its own efforts and experience"). To the extent the Court finds that CMS publicly disclosed its HIPAA-protected claims data, this case is a paradigmatic example of a relator demonstrating an undisclosed relationship between disclosed facts. Indeed, none of the CMS data nor government analysis referenced by the Defendants (*see* Mot. at 10) demonstrated the fraud uncovered by Integra. Simply because with the benefit of Integra's analyses the government could possibly replicate Integra's results, does not mean that Integra's work was any less independent or essential to uncovering the Defendants' fraud.

**B.     Integra's allegations state a claim under Rule 12(b)(6).**

In the Complaint, Integra alleges that the Defendants (i) knowingly presented, or caused to be presented, false claims to Medicare for payment or approval (31 U.S.C. § 3729(a)(1)(A)); (ii) knowingly made, used, or caused to be made or used, a false record or statement material to false claims to Medicare (31 U.S.C. § 3729(a)(1)(B)); and (iii) knowingly avoided an obligation to re-pay Medicare for overpayments (31 U.S.C. § 3729(a)(1)(G)).[3] Defendants move to dismiss each claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. In assessing whether Integra has stated a claim, the Court must accept the Complaint's

---

[2] The *Lam* court went on to apply a stricter pleading standard under Rule 9(b) that the Fifth Circuit has since rejected. *See* Section III.B.1, *infra*.

[3] "Knowingly" includes "deliberate ignorance," and "reckless disregard." 31 U.S.C. § 3729(b)(1).

factual allegations as true. *Id.* For this reason, Rule 12(b)(6) motions "are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

The Complaint must also "state with particularity the circumstances constituting" the fraud. Fed. R. Civ. P. 9(b).[4] "Rule 9(b)'s ultimate meaning is context-specific [. . .] depending on the claim at hand." *Kanneganti*, 565 F.3d at 188. For some claims, courts have found that Rule 9(b) requires the "time, place and contents" of each false representation—or the "who, what, where, and when"—but Rule 9(b) applies differently to FCA claims: "if [the relator] cannot allege the details of an actually submitted false claim, [the relator] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

Courts have found that this application of Rule 9(b) strikes a balance between preventing "fishing expeditions" and allowing for discovery in situations where records of the alleged fraud are largely in possession of the Defendants. As the *Kanneganti* court explains, "details of a scheme to present fraudulent bills to the Government and allegations making it likely bills were actually submitted limits any 'fishing' to a small pond that is either stocked or dead." *Id.* at 191.

### 1.    Integra alleges Defendants' upcoding scheme in detail.

Led by their head of Physician Documentation and Coding, Anthony Matejicka, Defendants engaged in a system-wide scheme to code unwarranted MCCs. (SAC ¶¶ 20–45.) Defendants accomplished this through three specific means. <u>First</u>, Defendants trained doctors and CDI staff to use "magic words" to "provide triggers for reimbursement," leading to higher paying MCCs. (*Id.* ¶ 24.) Training materials uncovered by Integra show that Matejicka openly steered doctors away from non-MCC diagnoses toward specific, higher-paying MCCs. (*Id.* ¶ 26.)

---

[4] Defendants do not argue that Integra failed to adequately plead knowledge, which may be alleged generally. *Id.*

Second, if Defendants' doctors ignored their training, Defendants sent the doctors leading "queries" that recommended MCCs—often including conditions unrelated to the patient's principal diagnosis. (*Id.* ¶ 27.) Third, Defendants provided patients with unnecessary services to justify adding MCCs to their file. (*Id.* ¶¶ 37–39.)

The Complaint further specifies three MCCs that Defendants' scheme promoted—encephalopathy, respiratory failure, and severe malnutrition—and provides 150 examples of Defendants' applying those MCCs.[5] Notably, many of Defendants' internal documents cited by Integra push these particular MCCs. (*See id.* ¶ 24 (training presentation encouraging doctors to diagnose encephalopathy and respiratory failure); ¶ 26 (tip sheet encouraging doctors to diagnose encephalopathy); ¶ 30 (query leading doctors to change diagnosis to various MCCs, including respiratory failure); ¶ 32 (surgical progress note for plastic surgery patients recommending a diagnosis of severe protein calorie malnutrition).)

Integra agrees there is nothing wrong with hospitals "taking full advantage of coding opportunities to maximize Medicare payment *that is supported by documentation in the medical record*." (Mot. at 14 (emphasis added).) But Defendants' scheme *corrupted the medical record itself*. Taking these specific allegations as true—as the Court must—Integra has pleaded its claims with sufficient specificity to comply with Rule 9(b)'s objectives of "ensuring the complaint 'provides defendants with fair notice of the plaintiffs' claims," while preventing "the filing of baseless claims as a pretext to gain access to a 'fishing expedition.'" *Kanneganti*, 565 F.3d at 191 (quotations omitted). Specifically, Defendants (i) knowingly caused false Medicare claims to be submitted when they encouraged their doctors to use "magic words" that triggered unwarranted MCCs (31 U.S.C. § 3729(a)(1)(A)); (ii) knowingly used leading queries to push

---

[5] Contrary to Defendants' assertion, Integra notes the Defendant that made each false claim. (SAC Tables 3, 6, 9).

doctors to diagnose unwarranted MCCs (31 U.S.C. § 3729(a)(1)(B)); and (iii) knowingly avoided repaying Medicare for amounts paid pursuant to unwarranted MCCs 31 U.S.C. § 3729(a)(1)(G)).[6]

Defendants' bullet-point list of cases do not suggest otherwise. For instance, in *U.S. ex rel. Bennett v. Medtronic, Inc.*, the court dismissed the relator's upcoding claim because it hadn't "identified any . . . sales representative or employee who encouraged hospitals or physicians to 'upcode' improperly." 747 F. Supp. 2d 745, 781 (S.D. Tex. 2010). Similarly, in *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, the relator did not allege any individuals that were involved in the fraud or the hospitals involved. 778 F. Supp. 2d 709, 720 (N.D. Tex. 2011). In stark contrast, Integra identifies both a specific executive and corporate department that promoted upcoding. (SAC ¶ 20.) The other Fifth Circuit case cited by Defendants actually declined to dismiss the relators' claims despite being based on conduct dating to before the defendant hospital was even incorporated. *See, e.g.*, *U.S. ex rel. Walker v. Corporate Mgmt., Inc.*, No. 2:07-cv-342-KS-MTP, 2012 WL 5287065, at *3 (S.D. Miss. Oct. 24, 2012).[7]

## 2. Integra's quantitative, statistical, and econometric analyses provide a reliable inference that Defendants carried out their scheme as alleged.

In addition to pleading details of the alleged fraudulent scheme, Integra has also pleaded extensive and "reliable indicia that lead to a strong inference that claims were actually submitted." *Kanneganti*, 565 F.3d at 190. Integra first grouped inpatient claims data for all short term acute care hospitals by 184 different principal diagnosis codes. Integra then used these groupings to compare usage rate of MCCs at hospitals in the Defendants' hospital system to

---

[6] Providers are required to report and return Medicare overpayments. *See* 42 U.S.C. § 1320a-7k.

[7] Defendants' cases outside the Fifth Circuit apply a stricter Rule 9(b) standard. *See, e.g.*, *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (applying Rule 9(b) standard rejected by *Kanneganti*).

usage rates in other acute care inpatient hospitals. Integra conservatively limited its findings to the 209 combinations of principal diagnosis codes and misstated MCCs that Defendants used more than twice the national rate or at a rate three percentage points higher than other hospitals. Integra further limited its findings to groupings in which there was a less than 1 in 1,000 chance the findings were due to chance. (*See* SAC ¶¶ 40–45 (discussing Integra's methodology).)

Moreover, Integra used linear regressions to control its findings for an array of conceivable characteristics that might innocently affect a hospital's MCC rates, including race, age, gender, principal diagnosis, length of stay, discharge stats, and treating doctor. (*Id.* ¶¶ 70–103.) As a result, Integra has demonstrated that there is only between 1/1,000 and less than 1/100,000,000 possibility (depending on the diagnoses) that the Defendants' excessive use of the relevant MCCs could be attributed to chance. (*Id.* Fig. 11.) The Fifth Circuit has expressly held that, together with details of a fraudulent scheme, a relator may "satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to each false claim." *U.S. ex rel. Duxbury v. Ortho Biotech Prod., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009). Integra's analyses go beyond "strengthening the inference" of fraud. It demonstrates Defendants' fraud with mathematical precision.

In trying to attack Integra's analyses, Defendants mistakenly cite ***the dissent*** of a decision that ***denied*** a strikingly similar motion to dismiss a complaint with far less specificity or reliable indicia than present here. *See U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 260 (3d Cir. 2016). In *Victaulic*, a relator brought an FCA claim against a pipe-fitting company for improperly marking the country of origin on its fittings to avoid import duties. *Id.* at 257. The complaint provided a public list of the company's shipments, together with a statistical analysis of markings on the company's goods available on eBay. *Id.* The

19

dissent—which the Defendants cite as the holding of the case—felt that the relator's analysis was simply "numerical guesswork." *Id.* at 260 (Fuentes, J., dissenting). The majority, however, correctly noted that "such skepticism is misplaced at the Rule 12(b)(6) stage." *Id.* at 257.

In contrast to *Victaulic*, Integra actually alleges far more details about Defendants' scheme, supported by a far more robust statistical analysis, based on profoundly more reliable data than eBay listings. Accordingly, Defendants' Motion must be denied.

**C.** **The allegations of Defendants' scheme are more than "plausible."**

Defendants vaguely argument that the Complaint fails to meet the standard of Fed. R. Civ. P. 8(a). Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule is designed only "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citations omitted). It requires no more than "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The Supreme Court has cautioned that "plausibility standard is not akin to a 'probability requirement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Here, not only does Integra allege facts that support a plausible inference of Defendants' misrepresentations, Integra's analysis confirms these misrepresentations with a level of certainty that range from 1/1,000 to less than 1/100,000,000. This is far more "plausible" than, for instance, the statistical analysis conducted in *Victaulic*, where the relator's analysis demonstrated the defendant's fraud with 99% confidence. 839 F.3d at 269. In fact, Defendants tellingly do not even bother to impeach Integra's analysis. Thus, taking all allegations as true—as the Court must at this stage—the Court should find that the Complaint satisfies Rule 8(a).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Integra respectfully asks that the Court deny the Motion and grant such further relief as the Court deems proper.

DATED: December 3, 2018                 Respectfully submitted,


                                         */s/ P. Jason Collins*
                                        P. Jason Collins
                                        jcollins@rctlegal.com
                                        Jeremy H. Wells
                                        jwells@rctlegal.com
                                        Scotty G. Arbuckle, III
                                        tarbuckle@rctlegal.com
                                        **REID COLLINS & TSAI LLP**
                                        1301 S Capital of Texas Hwy
                                        Building C, Suite 300
                                        Austin, Texas 78746
                                        T: 512.647.6100
                                        F: 512.647.6129

                                        *Counsel for Relator*
                                        *Integra Med Analytics LLC*

## CERTIFICATE OF SERVICE

I, Jeremy H. Wells, hereby certify that the foregoing document was served via the CM/ECF system of the United States Court for the Western District of Texas on December 3, 2018. Copies of the same have also been served on the United States pursuant to the Court's Order dated July 10, 2018.

*/s/ Jeremy H. Wells*