UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. INTEGRA MED ANALYTICS, LLC, | § § § § | No. 5:17-CV-886-DAE |
| Plaintiff, | § § | |
| vs. | § § | |
| BAYLOR SCOTT & WHITE HEALTH, BAYLOR UNIVERSITY MEDICAL CENTER-DALLAS, HILLCREST BAPTIST MEDICAL CENTER, SCOTT & WHITE HOSPITAL-ROUND ROCK, SCOTT & WHITE HOSPITAL TEMPLE, | § § § § § § § § | |
| Defendants. | § § | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (DKT. # 21)

Before the Court is a Motion to Dismiss filed by Defendants Baylor Scott & White Health, Baylor University Medical Center-Dallas, Hillcrest Baptist Medical Center, Scott & White Hospital-Round Rock, and Scott & White Hospital Temple (collectively "Defendants").  (Dkt. # 21.)  Pursuant to Local Rule CV-7(h), the Court finds these matters suitable for disposition without a hearing.  After careful consideration of the memoranda filed in support of and in opposition to the

1

motion, the Court—for the reasons that follow—**GRANTS** Defendants' Motion to

Dismiss.  (Id.)

## BACKGROUND

I.     Factual Background

Defendants in this *qui tam* action are the operator of a network of

inpatient short-term acute care hospitals and four of its affiliated hospitals.  (Dkt.

# 15[1] at 3.)  Part of the services Defendants perform are for patients covered by

Medicare, and therefore Defendants regularly submit requests to Medicare for

reimbursement for these services.  (Id.)  As such, these request for reimbursement

are subject to the False Claims Act ("FCA"), and knowingly presenting false or

fraudulent claims to the Government for reimbursement is illegal and incurs civil

liability.[2]  31 U.S.C. § 3729.  Plaintiff alleges that Defendants have submitted

"more than $61.8 million in false claims for Medicare reimbursement over the past

seven years."  (Dkt. # 15 at 5.)

---

[1] Because Plaintiff's complaint contains certain patient medical information,
Plaintiff filed both a sealed, unredacted version of its complaint (Dkt. # 17) as well
as an unsealed, redacted version (Dkt. # 15).  In this order, when citing to the
complaint, the Court will refer to the unsealed, redacted version.

[2] The Government has declined to intervene in this action. (Dkt. # 9.)

In order to determine the proper amount of reimbursement for services rendered to patients, Medicare groups patients with similar clinical problems that are expected to require similar amounts of hospital resources into what are called Diagnoses Related Groups ("DRG").  (Id. at 6.)  The DRG is primarily determined by three types of codes from a Medicare claim: (1) the principle diagnosis code[3]; (2) any surgical procedure code[4]; and (3) any secondary diagnosis codes[5].  (Id. at 7.)  The DRG can then be further adjusted based on hospital specific factors like market conditions in the hospital's city.  (Id.)

The allegations in this case concern Defendants' coding of secondary diagnosis codes, which determine the severity level of the DRG.  The Centers for Medicare and Medicaid Services ("CMS") publishes a list of codes each year that, when added to a claim, result in the claim being considered a "Complication or Comorbidity" ("CC") or a "Major Complication or Comorbidity" ("MCC").  (Id.)

---

[3] The principal diagnosis code is the "condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care." (Dkt. # 15 at 6.)

[4] The surgical procedure code represents surgical procedures performed in an operating room setting at the hospital.  (Id.)

[5] The secondary diagnosis code represents "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay."  (Id.)

When a CC or MCC secondary code is added to claim, the value of that claim can increase anywhere from $1,000 to $25,000.  (Id.)

Plaintiff alleges that Defendants engaged in a scheme to fraudulently upcode CCs and MCCs that were not justified by the underlying medical diagnosis in order to increase hospital revenue.  (Id. at 9.)  According to Plaintiff, effectuation of this scheme took many forms, spearheaded by Anthony Matejicka, Defendants' Medical Director for Coding and Utilization, through Defendants' Clinical Documentation Improvement ("CDI") program[6].  (Id. at 8.)

Plaintiff first alleges that Defendants trained its doctors and CDI staff by emphasizing coding for MCCs.  (Id. at 9.)  Such training included encouraging staff to use certain key words that would trigger or permit MCC coding, disseminating a list of MCCs to focus on, and having employees walk around with a list of MCCs to look for opportunities to assign them as secondary diagnoses. (Id.)  Defendants also allegedly emphasized to its doctors the importance of their coding efforts to both Defendants' revenue and the doctors pay for performance metrics.  (id.  at 10–11.)  Defendants also allegedly distributed tip sheets called

---

[6] CDI programs themselves are common in the industry and are typically designed to promote accurate documentation of patient diagnoses and treatments so that hospitals can be properly reimbursed for services rendered.  (Id. at 8.)

"Teal Quickies" that provided doctors with guidance on how to clinically document diagnoses in a way that is codable by CMS.  (Id. at 11–12.)

Plaintiff next alleges that Defendants pressured doctors to change diagnoses by sending them "queries" encouraging doctors to "specify" or amend their diagnoses when the initial diagnoses did not warrant a CC or an MCC.  (Id. at 12–16.)  According to Plaintiff, these "document clarification sheets" reveal an intent towards influencing doctors to code higher-paying CCs and MCCs because the query sheets largely provide only options that could permit coding for a CC or and MCC.  (Id.)

Finally, Plaintiff alleges that Defendants provided unnecessary treatment in order to permit them to code for MCCs.  (Id. at 19.)  In particular, Plaintiff alleges Defendants purposefully places patients on post-operative ventilator support, which enabled them to code for the MCC of acute respiratory failure.  (Id. at 19–20.)

Plaintiff's allegations primarily revolve around the coding of three particular MCCs ("Allegedly Misstated MCCs"): encephalopathy; respiratory failure; and severe malnutrition.  (Id. at 23.)  In order to support its allegations, Plaintiff requested and received from CMS inpatient claims data for short term acute care hospitals from 2011 through 2017 and applied various proprietary methods of statistical analysis on this data set.  (Id. at 21.)  The upshot of this

analysis is that Defendants coded for the Allegedly Misstated MCCs at rates

significantly higher than the average of other hospitals.  (Id. at 23–57.)  According

to Plaintiff, their statistical analysis further demonstrates that alternative hypothesis

such as patient characteristics and demographics, the preferences or treatment

decisions of physicians who work with patients at Defendants' hospitals, unique

characteristics of Defendants patients, or regional factors cannot explain

differences in coding rates of the Allegedly Misstated MCCs.  (Id. at 55–83.)  On

the strength of this analysis, Plaintiff alleges Defendants improperly received $61.8

million dollars from false claims due to fraudulent upcoding of the Allegedly

Misstated MCCs.  (Id. at 85.)

        Based on these allegations, Plaintiff assert one cause of action against

Defendants for violations of the False Claims Act.  Plaintiff alleges that

Defendants: (1) knowingly presented, or caused to be presented, false or fraudulent

claims for payment of approval, in violation of 31 U.S.C. § 3729(a)(1)(A);

(2) knowingly made, used or caused to be made or used, a false record or statement

material to a false or fraudulent claim, in violations of 31 U.S.C. § 3729(a)(1)(B);

and (3) knowingly made, used, or caused to be made or used, a false record or

statement material to an obligation to pay of transmit money or property to the

government, or knowingly concealing or knowingly and improperly avoiding or

decreasing and obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).  (Id. at 88–89.)

II.    Procedural Background

Defendants filed the instant motion to dismiss under the FCA's public disclosure bar, and under Rule 12(b)(6) for failing to plead fraud with particularity as required by Rule 9(b) and for failure to state a plausible claim for relief under Rule 8(a).  (Dkt. # 21.)  Plaintiff filed a response in opposition to Defendants' motion.  (Dkt. # 23.)  Defendants then filed a reply in support of their motion. (Dkt. # 24.)

This motion before the Court is fully briefed and ripe for review.

LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In analyzing a motion to dismiss for failure to state a claim, "[t]he court accept[s] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  In re Katrina Canal Beaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).

7

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

DISCUSSION

In order to prevail on FCA claim, a Plaintiff must plead and ultimately prove four elements: (1) "a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." United States ex re. Longhi v. United States, 575 F.3d 458, 467 (5th Cir. 2009) (quoting and adopting United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008).

As previously stated, Defendants asserts three grounds for the dismissal of Plaintiff's complaint: (1) Plaintiff's claim is barred by the FCA's Public Disclosure Bar; (2) Plaintiff has failed to plead fraud with particularity as required by Rule 9(b); and (3) Plaintiff has failed to state a plausible claim for relief as required by Rule 8(a). (Dkt. # 21 at 9.) Because the Court concludes that

dismissal is appropriate under Rule 8(a) working in conjunction with rule 9(b), the Court declines to reach Defendant's public disclosure bar arguments.

I.      FCA Pleading Requirements

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  "[A] complaint filed under the False Claims act must meet the heightened pleading standard of Rule 9(b)[.]"  United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009).  Under Fifth Circuit law, "the particularity demanded by Rule 9(b) differs with the facts of each case, [but] a plaintiff pleading fraud must set forth 'the who, what, when, and where . . . before access to the discovery process is granted."  Hart v. Bayer Corp., 199 F.3d 239, 247 (5th Cir. 2000) (internal citations omitted).  However, the Fifth Circuit later clarified that "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act."  Kanneganti, 565 F.3d at 190.  As applied in the context of an FCA claim, "to plead with particularity the circumstances constituting fraud for a False Claims Act  . . . claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false

claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Id.

Applying this standard, the Court concludes that Plaintiff's complaint, as discussed above, alleges a scheme, spearheaded by Anthony Matejicka, to increase the number of claims submitted that include CCs and MCCs and contains reliable indicia leading to a strong inference that claims were actually submitted based on that scheme. However, that conclusion does not end the inquiry. Plaintiff's complaint must allege that the scheme was to submit *false* claims. Id. And that is where Plaintiff's allegations fail.

The essence of Plaintiff's allegations is that Anthony Matejicka enacted a scheme to increase the number of patients whose services were coded for CCs and MCCs. That alleged scheme took several forms, including training doctors to document the medical record in a way that would permit coding for CCs and MCCs, training staff to be on the lookout for opportunities to code for CCs and MCCs and providing doctors with tip sheets and diagnosis clarification sheets that encouraged them to diagnose in ways that could permit coding for CCs and MCCs. (Dkt. # 15 at 9–19.) But such a scheme is not in and of itself one to submit false claims and is equally consistent with a scheme to improve hospital revenue through accurate coding of patient diagnoses in a way that will be appropriately

recognized and reimbursed by CMS commensurate with the type and amount of services rendered.

CMS "encourage[s] hospitals to engage in complete and accurate coding" and has "reaffirm[ed its] view that hospitals focus their documentation and coding efforts to maximize reimbursement."  Medicare Program, Changes to the Hospital Inpatient Prospective Payment systems and Fiscal Year 2008 Rates, 72 FR 47130, 47181[7].  CMS is well aware of the existence of hospital "methods for improving clinical documentation in order to increase reimbursement" and that hospitals "utiliz[e] clinical documentation specialists that work on the hospital treatment floors to encourage improvements in clinical documentation" to "improve coding and increase payment."  Id. at 47182.

Moreover, CMS has directly disavowed "the notion . . . that CMS believes changes in how services are documented or coded that [are] consistent with the medical record [are] inappropriate or otherwise unethical."  Id. at 47181. CMS does "not believe there is anything inappropriate, unethical or otherwise wrong with hospitals taking full advantage of coding opportunities to maximize Medicare payment that is supported by documentation in the medical record."  Id.

---

[7] To the extent necessary, the Court takes judicial notice of this report as a matter of public record.  The Court may take judicial notice of matters of public record. See Swindol v. Aurora Flight Sciences Corp., 805 F.3d 516, 518–19 (5th Cir. 2015)

CMS was fully aware that hospitals would "change their documentation and coding practices and increase case mix consistent with the payment incentives that are provided by the" then newly implemented MS-DRG system and fully supported this practice.  Id. at 47182.

Consequently, the mere fact that Defendants took targeted steps to increase their coding of CCs and MCCs to increase hospitals revenues is neither fraudulent, nor improper per se.  See United States ex rel. Bennet v. Medtronic, Inc., 747 F. Supp. 2d 745, 783 (S.D. Tex. 2010) (concluding that Defendant's encouraging hospitals to exploit an opportunity for legitimate profits "does not create a reasonable inference that physicians and hospitals knowingly summitted false claims").  To state a claim for relief, there must be an allegation that a defendant knew that using a particular code was incorrect.  Id.  Plaintiff has failed to make any such allegation.

At most, Plaintiff's complaint reveals is that Defendants made targeted efforts to encourage and incentivize diagnosing patients in a way that permitted the coding of CCs and MCCs.  But nothing in Plaintiff's complaint implicates a conclusion that these targeted efforts requested, demanded, or encouraged doctors and staff to diagnose in a way that was not justified by the physicians own medical opinions, judgments, and the medical record, beyond Plaintiff's mere conclusion that that is what the efforts reveal.  See Iqbal, 556 U.S.

678 (holding that a pleading that offers merely "labels and conclusions" is insufficient under Rule 8).  As previously stated, CMS takes the opposite view as Plaintiff.

The only allegations made by Plaintiff in any way implying that Defendants' coding efforts were in any way improper are the assertions that "medical coders then began to increasingly receive pressure directly from . . . leadership to code unethically" and that one former medical coder quit because she "was continually getting directives to compromise her integrity."  (Dkt. # 15 at 9.) But these allegations do not specify what the pressure was, who applied the pressure, or how the desired coding was unethical or fraudulent, and does not give any specific examples of any requests for unethical, inappropriate, or fraudulent coding.  Such "naked assertions devoid of further factual enhancement" are insufficient under Rule 8's pleading standards.  Iqbal, 556 U.S. at 678.

Further, Plaintiff's allegations are equally consistent with the conclusion that Defendants were taking steps to improve the accuracy and consistency of their medical documentation and coding so as to align it with terminology that CMS would recognize and reimburse appropriately.  "[W]here a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Id. at 678; see also Bell Atl. Corp., 550 U.S. at 567–69 (holding that

where there is an "obvious alternative explanation" that is legal, the complaint fails to state a claim for relief).  Emphasizing to doctors that they should diagnose and document in a way that CMS's coding scheme would recognize, as opposed to the clinical terminology the doctors were used to using, is not in and of itself fraudulent, and can be adequately explained as merely "taking full advantage of coding opportunities to maximize Medicare payment," something CMS has expressly endorsed. See 72 FR at 47181.

        This conclusion is even supported by some of the data provided in Plaintiff's complaint.  For each of the three Allegedly Misstated MCCs, as well as for all three collectively, Plaintiff's complaint provides bar graphs comparing Defendants use of the MCC as compared with the average of other hospitals, for the years 2011 through 2017.  (See Dkt. # 15 at 22, 25, 35, 46.)  In all four instances, the trend reveals that the average use of the Allegedly Misstated MCC's by other hospitals increased every year from 2011 to 2017, and by 2017 was within a few percentage points of Defendants' use of the MCC's.  (See id.)  This data is thus as consistent with the conclusion that Defendants were merely ahead of the industry in improving the accuracy of their coding as far as CMS reimbursements are concerned, and that the rest of the industry slowly but surely improved the accuracy of its own coding, closing the gap in the use of the Allegedly Misstated MCCs, as it is consistent with the conclusion that Defendants were submitting

14

fraudulently coded reimbursement requests.  Once again, "facts that are 'merely

consistent with' a defendant's liability, . . . stop[] short of the line between

possibility and plausibility of entitlement to relief."  Iqbal, 556 U.S. at 678.

   Plaintiff's statistical analysis allegedly demonstrating that no other

explanation but fraud accounts for the data it analyzed overlooks one major

alternative hypothesis: Defendants were simply better than their peers in their

efforts to ensure their medical documentation and coding maximized the

opportunities for legitimate reimbursement from CMS.  See Bell Atl. Corp., 550

U.S. at 567–69 (holding that where there is an "obvious alternative explanation"

that is legal, the complaint fails to state a claim for relief).  Ultimately, Plaintiff's

allegations are "not only compatible with" but arguably "more likely explained by"

lawful conduct.  Id. at 680.  In such instances, Rule 8 has not been satisfied.  See

id.; see also United States v. Catholic Health Initiative, 312 F. Supp. 3d 584, 598

(S.D. Tex. 2018) (finding that where a defendant's alleged conducted "was

legitimate, it renders implausible Relators' assertion that Defendants 'knowingly

and willfully'" violated the FCA).

   The closest Plaintiff's complaint comes to plausibly alleging a claim

for relief is its assertion that Defendants provided unnecessary treatment, in

particular mechanical ventilation for patients after undergoing major heart surgery,

enabling them to code for the MCC of acute respiratory failure.  (Dkt. # 15 at 19–

21.)  However, this conclusion appears to be based entirely on the mere fact that

Defendants provided this service at rates higher than average.  (See id.)  On Rule

12(b)(6) review, the Court does not "accept conclusory allegations, unwarranted

deductions, or legal conclusions."  Southland Sec. Corp. v. INSpire Ins. Solutions,

Inc., 365 F.3d 353, 361 (5th Cir. 2004).  And ultimately, medical diagnoses and the

proper course of treatment are "expressions of opinion of scientific judgments

about which reasonable minds may differ" and such "opinion[s] cannot be 'false'

for the purposes of the FCA" because "a lie is actionable but not an error."  United

States ex rel. Riley v. St. Luke's Episcopal Hosp., 335 F.3d 370, 376 (5th Cir.

2004).

        Plaintiff makes no allegations that any doctors were told, ordered, or

even encouraged to provide mechanical ventilator treatment in contradiction to

their own independent medical judgments.  (See Dkt. # 15 at 19–21.)  That

Defendants provided a certain treatment at rates higher than average, even

significantly higher than average, is not by itself indicative of fraud or unnecessary

treatment.  See Iqbal, 556 U.S. 678 ("Where a complaint pleads facts that are

merely consistent with a defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief.") (internal quotation marks

omitted).  Plaintiff's bare allegation that Defendants provided medically

unnecessary procedures to permit them to fraudulent code MCCs is thus

insufficient to state a claim for relief.  See id. (holding that "a pleading that offers labels and conclusions" and merely "tenders naked assertions" is insufficient under Rule 12(b)(6).)

Accordingly, the Court finds that Defendants Motion to Dismiss should be **GRANTED**.  (Dkt. # 21.)  Further, because the operative complaint is Plaintiff's second amended complaint, meaning Plaintiff has had at least two opportunities to reformulate their allegations to state a claim for relief that satisfied federal pleading standards, Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

## CONCLUSION

For the reasons stated, the Court **GRANTS** Defendants' Motion to Dismiss.  (Dkt. # 21.)  Plaintiff's claims are **DISMISSED WITH PREJUDICE**, and this case is **CLOSED**.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, August 5, 2019.

_____

David Alan Ezra
Senior United States Distict Judge